In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-2326

JOHNNIE BROWN,

Petitioner-Appellant,

v.

JERRY STERNES, Warden,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 5341—**William T. Hart**, *Judge.*

ARGUED JANUARY 8, 2002—DECIDED SEPTEMBER 4, 2002

Before POSNER, COFFEY and DIANE P. WOOD, *Circuit Judges.*

COFFEY, *Circuit Judge.* This case is before us on a writ of habeas corpus. In 1991, Petitioner-Appellant Johnnie Brown ("Brown") was arrested, and shortly thereafter convicted after a bench trial of armed robbery and was sentenced to the maximum term of 30 years imprisonment. After exhausting his appeals in the Illinois state court system, Brown petitioned for relief in the federal district court under 28 U.S.C. § 2254, alleging that he had received ineffective assistance of counsel and arguing that his attorneys failed to bring his mental problems to the court's attention and that the proceedings in the state court infringed upon his constitutional right not

to be tried when mentally incompetent. The district court dismissed Brown's petition on April 19, 2001. Brown appeals. For the reasons we set forth, we conclude that Brown was denied his Sixth Amendment right to effective assistance of counsel. We remand with instructions to grant the writ of habeas corpus unless the State of Illinois elects to retry Brown within a reasonable time to be determined by the federal district court.

This case exposes a tragic breakdown in the Cook County, Illinois criminal justice system. A mentally ill criminal defendant of recent vintage was arrested, put on trial, convicted of armed robbery, and sentenced to a term of thirty years without anyone taking proper notice of the fact that this same defendant had been diagnosed on more than one occasion, confined and treated (from 1986-88), and medicated intermittently for chronic schizophrenia for an extended period of years. His *court-appointed attorneys* provided a halfhearted defense, neglecting to thoroughly investigate his medical condition and failing to procure medical records establishing that he suffered from a myriad of psychiatric problems. Thereafter, the attorneys proffered self-serving affidavits once their lackadaisical lawyering was revealed and challenged. Their less-than-lawyer-like attention to duty caused problems for the *court-appointed psychologist and psychiatrist*. These doctors, relying on inadequate data, filed reports with the court that could best be classified as incomplete, as they ignored essential documentation of his medical history (*i.e.*, his past psychiatric records), a basic element and requirement of any competency evaluation, and furthermore overlooked important information easily ascertainable from the defendant's family members. The *state probation officer*, in preparing the pre-sentence investigative report, neglected to interview the defendant's family members, to make a thorough inquiry about Brown's prior confinement, (*i.e.*, his adjustment to his institution), to investi-

gate the circumstances surrounding his general discharge from the Navy, or his mental health history. Thus, the *sentencing judge* was less than well-informed of critical information, including the defendant's long and well-documented history of mental illness, as well as his prolonged period of treatment and confinement in a psychiatric unit during his prior imprisonment.

# I. FACTUAL BACKGROUND

## A. *Brown's Medical History*

Brown's medical records reflect that he was initially diagnosed to be suffering from *chronic schizophrenia*[1] in 1986 while incarcerated in the Menard Correctional Facility in southern Illinois. During his period of confinement, Brown was found to be unable to function in the minimum security unit of the facility because he was mentally incapable of following the orders of the security personnel and counselors, which in turn necessitated his transfer to the prison's psychiatric unit. Brown's treating psychiatrist at Menard, Dr. Vallabhaneni, noted in his reports throughout 1986 that Brown had "no ability to communicate" and had admitted to hearing voices that "help him to do his time." Dr. Vallabhaneni diagnosed him as suffering from *chronic schizophrenia* and prescribed various anti-psychotic medications for Brown on a regular basis and continued to treat his mental illness until his release in 1988. During the defendant's period of treatment, Dr. Vallabhaneni noted on at least

---

[1] Schizophrenia is a "common type of psychosis, characterized by abnormalities in perception, content of thought, and thought processes (hallucinations and delusions) and by extensive withdrawal of interest from other people and the outside world, with excessive focusing on one's own mental life." *Stedman's Medical Dictionary* 1601 (27th ed. 2000).

four occasions in 1986 and 1987 that Brown was "probably hallucinating," and that Brown was not only uncooperative, but demonstrated little or no insight into the existence of his psychiatric problems and frequently refused to take his prescribed medication. Throughout this period Brown insisted that he was not mentally ill and spoke very little about his mental condition with Dr. Vallabhaneni. After nearly two years of confinement and treatment, Dr. Vallabhaneni noted on May 1, 1988 that Brown's psychiatric problems are "in a chronic state and he is not making any progress or worsening either."

In 1989, after Brown's release from prison, he applied for Social Security disability benefits. As part of his application for benefits, Dr. Mark Amdur, a consulting psychiatrist for the Social Security Administration, evaluated Brown and once more diagnosed him as *suffering from chronic schizophrenia.* Dr. Amdur observed and diagnosed the following symptoms: impaired concentration and attention, stilted speech with moderately severe irrelevancy and illogicality, loosened associations, and auditory hallucinations. Additionally, Dr. Amdur interviewed Brown's mother, who is a nurse, about his mental state, and she advised the doctor that his "mind is random" and that he makes sense one minute and then "goes into autistic position and talks to himself." Brown's mother also reported that he told her that he heard voices. Unfortunately, not one of these records referred to above was reviewed by the court-appointed mental health doctors who examined Brown, much less introduced into evidence by Brown's attorneys at his state criminal trial.

## B. Brown's Arrest

The police report and the trial testimony from the victim and the defendant outline essentially similar conduct

on the part of the defendant at the time of the crime. At about 12:45 a.m. on March 26, 1991, roughly an hour before the armed robbery occurred, the defendant and the victim, James Brown,[2] engaged in a brief conversation about a cigarette. About an hour later, the defendant encountered the victim a second time. According to the victim, the defendant grabbed him from behind, held a pearl-handled knife to his throat, and demanded "everything [he] had," which amounted to fifty cents and an adult bookstore token. The defendant, however, testified that he was in fear for he believed the victim was following him and that he thought the victim was going to attack him. The defendant said he grabbed the victim, "showed him" the knife, demanded to know why the victim was following him, and only then did he ask the victim for money. Brown was apprehended a few minutes later, and the police recovered a pearl-handled knife, some change, and an adult bookstore token.

## C.  Brown's Pre-Trial Proceedings

On April 17, 1991, Asst. Public Defender Camille Kozlowski was appointed to represent Brown. Six months later, on October 28, 1991, on what was to have been the date of Brown's criminal trial, Kozlowski asked the court for a continuance in order that she might arrange for Brown to be evaluated both for "mental competency" and for "sanity." When the judge asked why she had waited until the day of trial to raise this issue, Kozlowski replied that just that morning, Brown had informed her that Professor Thomas Geraghty, director of the Northwestern University Law Center, had previously represented Brown. Kozlowski telephoned Geraghty, who advised her

---

[2]  The defendant, Johnnie Brown, and the victim, James Brown, are not related.

that Brown had once been found "unfit for trial" and that while incarcerated at Menard he had received "large doses" of "psychotropic" medication.

The trial judge, reluctant to grant the continuance on such short notice, was eventually persuaded by an insistent Ms. Kozlowski. She stated that after first meeting Brown, she realized that there was "something different" about him. She complained to the judge of her "difficulties" communicating with Brown, that he did "not answer some of my questions," and that he "yelled at my law clerk." She also told the judge that this new information about Brown's mental issues "certainly answers some of the questions that I had." The rest of her on-the-record statements bear quoting at length, especially in light of her later prevarications:

> Your honor, if there is an issue of fitness or sanity, I believe justice is not going to be served unless we have that answer, an answer to that. I would apologize to the Court for any inconvenience, but this is a serious case as it is a Class X case; Mr. Brown is looking at six to thirty years in the penitentiary. And I think it's very important that we look into these issues. I am not doing this at the last minute to avoid trial, obviously, your Honor, I would only do it because this man, who is the legal assistant dean at Northwestern indicated that he—Mr. Brown—has some serious background, psychiatric background.

Kozlowski concluded her supplication by notifying the judge that she had just begun to attempt to secure Brown's "records from the Psychiatric Institute" at Menard, that the authorities there stated "they are looking for them," and that she "just need[ed] to examine those records." The judge granted the motion and set a status hearing for November 25, 1991, after a Behavioral Clinic fitness and sanity evaluation (BCX) could be performed. The rec-

ord reflects that Kozlowski subpoenaed Brown's medical records from the Illinois State Penitentiary on November 1, 1991.

*D. Brown's Mental Health Examinations*

On November 19 and 21, 1991, doctors from the Cook County Circuit Court's Psychiatric Institute, at the direction of the criminal court, interviewed and examined Brown to determine his fitness for trial, sanity, and ability to understand his constitutional rights. These examinations were conducted *without the benefit of Brown's history of mental illness, treatment, and confinement in the Menard psychiatric unit.*[3] His mental history had not been forwarded to the court. Despite her stated belief that there was "certainly an issue of sanity" and her prior request to the trial judge, Brown's court-appointed attorney Kozlowski not only failed to follow up on her subpoena, but also failed to advise the court-appointed doctors (Psychiatric Institute) that she *had been informed that Brown had a recent history of treatment for mental illness and of his confinement in the psychiatric unit at Menard.*

The record reflects that during Brown's initial competency exam on November 19, he personally made the court-appointed psychologist, Dr. Rabin, aware of the fact that he had a history of prior psychiatric problems and treatment. Brown informed Dr. Rabin that he suffered from multiple hallucinations ("auditory, visual, olfactory, and tactile"), had been placed in a "special unit" at Menard, and was prescribed the anti-psychotic medication thiothixene

---

[3] Whereas it is clear that individuals with chronic schizophrenia often do not fully recover normal functioning and typically require long-term treatment, generally including medication, to control the symptoms, conducting an examination without the benefit of Brown's records is problematic, to say the least.

("Navane") for some two years while in confinement. Dr. Rabin's report is summary in nature, evidenced by the fact that he made but a most modest effort to test the credibility of Brown's assertions concerning his mental health history, his ingestion of prescribed anti-psychotic medication, and his confinement in a psychiatric unit at Menard. Furthermore, he made no effort to locate Brown's medical records to ascertain the veracity of Brown's claims. On the contrary, Dr. Rabin's written report simply reflects his summary dismissal of Brown's statements concerning his illness, and an acknowledgment that Brown "dropped his allegations of multiple hallucinations" after he had "confronted and pushed" Brown.[4] Dr. Rabin's conclusion that Brown was fabricating his history of mental illness (referring to him as "malinger[ing] in a half-hearted way"), is a particularly dubious judgment when the subject has just recently been diagnosed as a chronic schizophrenic.[5]

Two days later, on November 21, 1991, Dr. Gerson Kaplan, a psychiatrist at the Psychiatric Institute, met with Brown to evaluate his fitness to stand trial. Prior to interviewing Brown, Dr. Kaplan reviewed the arrest report as well as Dr. Rabin's report. Even though *Dr. Rabin's notes reflected that Rabin had discussed Brown's prior psychiatric treatment and confinement at Menard*

---

[4]  It is well established that persons suffering from schizophrenia behave differently at different times and experience psychotic episodes that come and go. *See* National Institutes of Health, *Schizophrenia*, at http://www.nimh.nih.gov/publicat/schizoph.htm.

[5]  "A well-established history of disorder before the relevant criminal behavior is also useful in helping to rule out malingering [pretending to be ill], although it is not unheard of for even genuinely disordered persons to recall their symptoms at will if it appears to be in their interests to do so." Robert D. Miller & Edward J. Germain, *The Retrospective Evaluation of Competency to Stand Trial*, 11 Int'l J.L. & Psychiatry 113, 122 (1994).

*with him, Dr. Kaplan also failed to conduct an adequate investigation into the possibility that Brown had in fact been diagnosed as suffering from chronic schizophrenia and had received treatment, including medication, for his mental illness*. Dr. Kaplan's report briefly discussed Brown's claims of a previous history of psychiatric problems:

> Defendant states his only psychiatric history was in 1988, when he was stabbed while he was at Menard and he said at that point, he was placed on psychiatric medication, he is vague as to the reasons for this or what the medication was. . . . Defendant denies any other psychiatric history other then [sic] the above mentioned history from Menard.

The record reflects that Dr. Kaplan, even though aware of Brown's claim to have been confined in the Menard psychiatric unit, offered no explanation for his failure to attempt to get information from either Kozlowski or from Menard about Brown's stated psychiatric problems in testing Brown's history of past recollection for accuracy and truthfulness. In spite of the absence of information concerning Brown's case history, Dr. Kaplan concluded that the defendant was "mentally fit for trial" as of November 21, 1991, and furthermore went on to find that he was legally sane at the time of the commission of the offense charged, and submitted this recommendation to the court.

### E. Brown's Status Hearing

Brown appeared in court for a status hearing on November 25, 1991. On the basis of Dr. Kaplan's medical report, the trial judge concluded that Brown was fit to stand trial. Kozlowski, in spite of her wealth of knowledge about her client to the contrary, *failed to object or question Kaplan's competency recommendation in any manner, much less the court's finding that Brown was mentally competent to proceed to trial*. She also neglected to make

the court aware that the prison authorities at Menard had not yet complied with the subpoena for the records. Kozlowski's less than vigorous approach in advocating her client's interests came in spite of several important facts: (1) she had been informed by Geraghty, the Northwestern University Law School professor, that Brown had previously been prescribed and received anti-psychotic medication; (2) she had also been informed by Geraghty that Brown had previously been found unfit to stand trial; (3) she had been having difficulty communicating with Brown and had as well advised the court of the episode when he yelled at her law clerk; (4) she had earlier expressed to the trial judge that there was "*certainly an issue of sanity*"; and (5) she had subpoenaed, but never received (and neglected to continue her investigation into the failure to produce) Brown's medical records from Menard.

Not surprisingly, as a result of the inadequate work products of the public defenders and the court-appointed doctors, the court found Brown competent to stand trial and set the date for his criminal proceeding in January 1992.

*F. Brown's Trial*

On January 30, 1992, the day of the defendant's trial before Judge Morissey in the Cook County Circuit Court, Kozlowski was ill. At trial he was represented by a substitute public defender, Lafonzo Palmer, who met Brown for the first time that morning. Kozlowski neglected to inform Palmer of Brown's questionable conduct with her and her law clerk as well as the fact that she had been informed that Brown had suffered recently from mental problems, that he had been confined in a psychiatric unit while receiving treatment at Menard, and furthermore that she had as of that date been unable to obtain Brown's medical records. As a result of these problems in

the Cook County, Illinois justice system and state prison system, attorney Palmer conducted Brown's defense *totally unaware* of the fact that Brown had been previously diagnosed as suffering from chronic schizophrenia and had been treated for the same. The only knowledge that Palmer had regarding Brown's mental condition was the November 21, 1991, report in Brown's file from Dr. Kaplan stating that Brown was competent to stand trial and was also sane at the time of the offense.

Brown waived his right to a jury trial and entered a plea of not guilty, although the transcript of Brown's colloquy with the judge reveals Brown's confused responses to the judge's questions about the waiver of his constitutional rights. A 30-minute bench trial ensued, during which time only three witnesses (the victim, the arresting officer, and Brown) testified. During Brown's short time on the witness stand, the judge's own frustration with Brown is evident, as the judge had to instruct Brown repeatedly to speak so that he could be understood. The essence of Brown's testimony was (like his statement to the police) that he believed the victim was following him, that he was going to attack him, and that his use of the knife was designed to scare the victim away.

Shortly after the defense rested, the judge mentioned that he thought he had observed Brown laughing at an inappropriate time during the trial and asked Brown if "there was something funny?" At that point, Brown engaged in an outburst of random obscenities and insults directed at the court as follows:

> MR. BROWN:  F*** you, Jack. Hear what I am saying?
>
> THE COURT:  Take it easy, Mr. Brown.
>
> MR. PALMER:  Be quiet, Johnnie.
>
> MR. BROWN:  I am grown. I am locked up, mother f***er. That is my mother f***ing ass.

MR. PALMER:  I know that, Johnnie. I know. I know. I know.

MR. BROWN:  You are a lying mother f***er.

MR. PALMER:  Just relax. It is okay.

MR. BROWN:  Can I go to the washroom?

THE COURT:  We are waiting on opening argument.

MR. PALMER:  Just a second. You can go to the washroom. Tell the Judge you are sorry.

MR. BROWN:  Excuse me.

After the oral exchange between the defendant, the court, and the defense attorney, Brown's attorney waived closing argument and the trial judge proceeded to find Brown guilty of armed robbery. His counsel, Palmer, at this time moved for a psychiatric examination prior to sentencing in light of Brown's in-court, uncontrolled and irrational outburst at the conclusion of the trial. The trial judge took the motion under advisement but never ruled on it, for reasons unexplained.

## G.  Brown's Sentencing Hearing

At the February 25, 1992, sentencing hearing, Brown was again represented by Palmer. Since nearly a month had passed, Palmer certainly had the opportunity to acquaint himself with Brown's file, which included a copy of the Menard subpoena Kozlowski had served. Though Menard had *still not* complied with the subpoena for Brown's medical records, and even though his client was being sentenced *without the benefit of these critically important documents*, Palmer failed to make even a cursory inquiry into the reasons Kozlowski had sought the records, much less into the reasons why the prison had failed to produce them. Even though Palmer had ob-

served Brown's erratic behavior and outburst at trial, and in spite of the fact that he knew or should have known about Kozlowski's subpoena and Menard's inaction on that subpoena, Palmer failed to request an adjournment of the sentencing to allow him more time to produce these records.

The sentencing was also affected by the incomplete and inaccurate pre-sentence report that had been filed with the court. The investigating officer who authored the report, Sunsaray Hodges, failed to collect information about and report on Brown's family history, psychiatric history and illness, prior psychiatric treatment and confinement, the circumstances surrounding his general discharge from the Navy, and his conduct while in prison. Thus, because of this inaccurate report, the judge was *still unaware at the time of sentencing that Brown had been diagnosed as suffering from chronic schizophrenia.*

As this court has stated before (though in a slightly different context), a sentencing judge's inquiry is broad in scope, "largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Gerstein*, 104 F.3d 973, 978 (7th Cir. 1997) (quotation omitted). The reasoning for this is plain:

> The sentencing stage of a trial is one of the most important parts of the criminal process. In order for a judge to be well advised of the facts surrounding the defendant's background, and particularly in view of the judge's obligation to the general public, as well as to the defendant, to be fair, reasonable, and just, it is imperative that he be allowed to draw upon a wealth of information concerning the defendant's background, from his date of birth up to and including the moment of sentencing. . . . In order to render justice to all the judge must be able to impress upon a defendant through the expansive contents of an all

encompassing sentencing report that we are a country of laws and not men.

*Id.*

During the sentencing hearing, Palmer asked the trial judge to consider Brown's strange behavior *at trial* as a mitigating factor in the severity of his sentence:

> I understand there was a psychiatric evaluation in this case. I understand he did come back fit; however your Honor did see his demeanor throughout the trial, and I'd ask your Honor to take that into consideration, that although he did come back legally fit, you saw everything that occurred in the court, Judge. And I'd ask your Honor not to ignore that. This is a man who does have problems. This is a man who is not an extremely—a violent person. *This is not a person who on his own volition is a violent person.* We would ask the court to take all of that into consideration in sentencing him, and we would ask for leniency in the sentence.

The trial court responded that "*certainly some psychological observation of [Brown] is in order*," but in spite of this comment reflecting his awareness of the problem and in spite of the request for a psychiatric exam (on which the court failed to act), the judge went on to conclude that Brown was fully responsible for his own actions at the time of the offense and went on to describe him as a "*pathetic individual*" who "could have overcome" his "pathos" "a long time ago" if he had "made some effort" to do so. The judge found him guilty, and in sentencing him to the maximum term for armed robbery, 30 years, stated that Brown had "virtually no hope for rehabilitation."

### H. Post-Conviction Proceedings

The Illinois Appellate Court affirmed Brown's conviction and sentence on direct appeal. Thereafter Brown

filed a *pro se* petition for post-conviction relief in the state court, alleging without any evidentiary support that his prison sentence violated several unidentified constitutional rights. The state trial judge summarily dismissed the petition as frivolous and legally insufficient.

Brown appealed the dismissal of the petition, and the Illinois Court of Appeals appointed the Cook County public defender to represent Brown. Shortly after the appointment, Brown's public defender filed a motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), on the ground that Brown's *pro se* petition failed to allege facts sufficient to give rise "to a deprivation of constitutional rights." The motion to withdraw was granted, and his representation was transferred to and assumed by attorneys from the Northwestern University Legal Clinic.

At this point, Brown's fortunes began to improve. New counsel immediately moved the appellate court for leave to amend the *pro se* petition and to supplement the trial record with Brown's Menard mental health records (mental history referred to above) as well as the records from the Social Security Administration.[6] The Illinois Court of Appeals denied the motion to supplement the record and amend the petition, affirming the dismissal of Brown's *pro se* petition for post-conviction relief. At the same time, however, the state appellate court noted, in light of the medical evidence submitted on Brown's behalf in counsel's motion to amend the petition for post-conviction relief, that fundamental fairness would require that Brown be given the opportunity to file a second post-conviction petition at the trial court level.

---

[6] The record is silent as to how the Northwestern Legal Clinic's attorneys were able to obtain Brown's psychiatric records from Menard, while Kozlowski was not. The record does reveal that Kozlowski's subpoena was served on the prison authorities by mail on November 1, 1991 by the Cook County clerk.

Brown followed the direction of the Illinois Appellate Court and returned to the trial court, filing a second post-conviction petition seeking relief on the grounds that his trial counsel was ineffective for failing to make a professional, lawyer-like effort to ascertain whether the defendant had a history of mental illness after counsel had been so advised. Furthermore, Brown argued that his trial counsel (Palmer) had been ineffective in failing to challenge the doctor's conclusion that Brown was fit to stand trial and that he was sane at the time of the offense. In addition, Brown argued that his due process rights were violated when he was forced to go to trial while mentally incompetent.

In support of Brown's petition for post-conviction relief, Brown's new attorneys retained Dr. Keenan Ferrell, a clinical psychologist, to examine and evaluate Brown in order to ascertain if Brown was suffering from a mental illness and, if so, the nature thereof. Dr. Ferrell examined Brown on December 3, 1995, and as part of this examination reviewed the records of Brown's conviction, his mental health records (from Menard as well as the evaluation conducted by the Social Security Administration) and in addition interviewed Brown's mother and older brother. Dr. Ferrell's report states in pertinent part as follows:

> *The irrational, child-like, immature manner in which Mr. Brown executed his recent crime demonstrates a lack of logical, cohesive thinking processes . . . .* Mr. Brown's execution of his crime indicates a combination of the various components of his disturbed thoughts. First, he felt he was under attack, secondly, he perceived himself as a criminal, and thirdly, he felt a sense of urgency to simply get the incident over with. *Mr. Brown has prominent paranoia and at that time he believed that he was about to be attacked, as he reported during his trial.*

* * *

Mr. Brown admitted to having previously been on prescription medication. Currently he has been off this medication for so long that he is not responsible or rational enough to make appropriate decisions. *Therefore, all decisions Mr. Brown made while off his medication should indeed be viewed as the decisions of an irresponsible, unreasonable, and illogical man . . . . [I]t is felt that Mr. Brown has the diagnosis of Schizophrenia, Residual Type.*

\* \* \*

Personality data and clinical interview indicated that *Mr. Brown has chronic, significant mental health problems which hinder his daily functioning. He tends to be extremely withdrawn, he continually fears that others are out to hurt him, and he was with [sic] poor insight into his emotional problems. Mr. Brown's thoughts are dominated by a severely disturbing, chronic mental illness known as schizophrenia. It is this examiner's opinion that this disorder has interfered with Mr. Brown's thought processes for the majority of his life, apparently since adolescence. Therefore, his past criminal acts were clearly committed while under the thought-distorting effects of schizophrenia.*

The state opposed Brown's petition for relief and, in spite of the record to the contrary, saw fit to argue that Brown's attorneys had no reason to suspect Brown was schizophrenic. The state somehow steadfastly adhered to its belief in the accuracy of Dr. Kaplan's findings pronouncing Brown competent to stand trial as well as sane at the time of the offense. In support of its argument, the state presented affidavits from public defenders Kozlowski and Palmer. In her *post hoc*, self-serving affidavit, Kozlowski provides blanket and general statements that Brown "*[a]t all times . . . was lucid and coherent . . . and did not demonstrate delusional behavior*" and further that she

had no indication that "*he did not understand the proceedings against him or could not cooperate with counsel*."

To describe Kozlowski's sworn affidavit as "not worthy of credence" is to put it mildly. She made all of the assertions as to his competency in her *post hoc* affidavit in spite of the record, which so eloquently sets forth her personal knowledge of Brown's mental history, her experience with her client, and her previous in-court, on-the-record vigorous plea for a mental examination of her client. Furthermore, Kozlowski's affidavit fails to offer an explanation, much less a reason, as to why she abandoned any further effort to investigate Brown's mental condition, or to follow up on the subpoena she had requested for her client's psychiatric records. Finally, *Kozlowski's affidavit*, in which she claims she believed that "*[a]t all times [Brown] was lucid and coherent*," is most inconsistent with her earlier representation to the trial judge that there "*certainly [was] an issue of sanity*," not to mention her request for a continuance in order to investigate Brown's medical history.

Palmer's affidavit is as defensive and as incomplete as Kozlowski's. He avers, for example, that during his conversation with Brown the morning of trial, Brown was both "*lucid and coherent*" and was able to assist in the preparation of a defense. But then Palmer *fails to make any explanation of why he moved for a psychiatric evaluation* shortly after the completion of the trial and before sentencing, when he had observed firsthand *Brown's uncontrolled and irrational outburst during the court proceeding* as described herein. Furthermore, he also fails to elucidate in his affidavit why he never renewed this motion for a psychiatric evaluation nor did he request that the court rule upon his pending motion before sentencing.

With this new material in front of him, the state trial court judge thus had a second chance at the bat to rule on Brown's fitness. Despite having the benefit of the

mountain of evidence (including the missing psychiatric reports from Menard (1986-88) as well as Dr. Ferrell's 1996 report and finding of schizophrenia) submitted by the Northwestern University attorneys in support of Brown's petition, *the judge dismissed the second petition for post-conviction relief without even so much as holding an evidentiary hearing*. The trial court ruled and stated that although Brown did exhibit some bizarre behavior during the trial proceedings, the state court proceedings "*did not amount to a substantial denial of Mr. Brown's constitutional rights*" (ineffective assistance of counsel).

Brown then appealed—for a third time—to the *Illinois Appellate Court*, which affirmed the state trial court's dismissal, holding that there was "*no compelling basis or reason for counsel to further investigate defendant's mental condition*," despite the fact that the record reflects that *he was confined in the Menard psychiatric unit while being treated for chronic schizophrenia from 1986 to 1988*. The state appellate court somehow reasoned that Brown's trial attorneys had no reason to pursue an investigation of Brown's mental condition, evidently believing the assertions that Kozlowski and Palmer had made in their affidavits; to wit, that they had not been informed of the *specific nature and diagnosis* of his problem and because he was "lucid and coherent" on the particular days during which their representation brought them in contact with him.

The reasoning and comments of the state appellate court can best be described as alarming, confusing, and most surprising, particularly as *the court never saw fit* to deal with the newly presented evidence through the valiant efforts (once again) of the Northwestern University Law Center attorneys detailing his prior and well-documented psychiatric history and confinement. Neither did the court see fit to analyze the problem of the lack of diligence and attention on the part of Brown's attorneys

(Kozlowski and Palmer) in failing to gain access to his past psychiatric problems. We are at a loss to understand the court's conclusion—that there was "*no evidence that if Dr. Kaplan had reviewed [Brown's Menard] medical records, he would have altered his fitness finding*"—if only because of the contrary findings of two different psychiatrists (Dr. Vallabhaneni from Menard and Dr. Amdur consulting for the Social Security Administration), both of whom conducted independent evaluations of Brown and both of whom *emphatically concluded* at the time of their respective evaluations that Brown *was suffering from chronic schizophrenia*.[7] Similarly, we have great difficulty in accepting and can neither comprehend nor concur in the court's contention that Brown's *complete medical history (including Dr. Ferrell's report) would have failed to support an insanity defense or persuade the trial judge to impose a shorter prison sentence*. The Illinois Appellate Court rejected Brown's due process claim, once more without giving us the benefit of an analysis of the problem created by Brown's attorneys' lack of diligence in gaining custody of his documented history of chronic schizophrenia (Menard). The court simply stated that the quantum of evidence submitted was insufficient to conclude that he was unfit to stand trial. The Illinois Supreme Court denied leave to appeal.

After being spun around in the Illinois state court system for three years, Brown (and his Northwestern University Law Center attorneys) then wisely turned to the federal courts for relief, filing a petition under 28 U.S.C.

---

[7] The long-term prognosis of schizophrenia varies. "In general, one-third of [persons with schizophrenia] achieve significant and lasting improvement, one-third achieve some improvement with intermittent relapses and residual disability, and one-third experience severe and permanent incapacity." *The Merck Manual of Medical Information* 437 (Robert Berkow, M.D., ed., 1997).

§ 2254 in the Northern District of Illinois, arguing that: (1) he was denied his Sixth Amendment right to effective assistance of counsel by his attorneys' failure to adequately investigate his mental health dealing with the question of his fitness to stand trial, his sanity at the time of the offense, and as a mitigating factor in his sentencing; and (2) his Fourteenth Amendment due process rights were violated because he went to trial when he was mentally unfit. The district court held that the Illinois Court of Appeals reasonably decided these issues against Brown and denied the petition. Brown appeals.

## II.  ISSUES

Brown initially argues in his habeas appeal that his trial attorneys were ineffective for at least two reasons: (1) their lack of diligence in investigating his history of mental illness even after they had been made aware of it; and (2) their failure to bring his history of mental illness to the state trial court's attention. Brown alleges that his counsel failed to unearth several important facts crucial to his defense; namely, that he had in recent vintage been diagnosed twice as suffering from chronic schizophrenia, that he had in fact been prescribed anti-psychotic medication for this illness, and that he had been treated and confined in the psychiatric unit at Menard from 1986 to 1988. Brown argues that his trial attorneys' failure to act diligently prejudiced him because it precluded him from: (1) receiving a proper competency hearing; (2) raising an insanity defense; and (3) arguing that he should receive a more lenient sentence in light of his mental illness.

Brown also claims that he was denied his Fourteenth Amendment due process right because he was tried and convicted when he was mentally incompetent to stand trial.

## III.  ANALYSIS

*A.  Standard of Review*

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), a state prisoner who files for a writ of habeas corpus must establish that the state court proceedings:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ellsworth v. Levenhagen*, 248 F.3d 634, 638 (7th Cir. 2001). A state court's decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth" by the Supreme Court or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*, 529 U.S. at 405-06. With respect to the "unreasonable application" prong, the petitioner must demonstrate that the state court identified the correct governing legal rule but unreasonably applied it to the facts of the case. *Id.* at 407; *Matheney v. Anderson*, 253 F.3d 1025, 1041 (7th Cir. 2001); *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000).

Although state court legal conclusions, as well as mixed questions of law and fact, are before us under the *de novo* standard, that standard is also tempered by AEDPA's deferential constraints: the "criterion for assessing the reasonableness of a state court's application of Supreme Court case law, pursuant to § 2254(d)(1), is whether the determination is at least minimally consistent with the

facts and circumstances of the case." *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999) (quoting *Sweeney v. Parke*, 113 F.3d 716, 718 (7th Cir. 1997)). We can only conclude that the *state court's conclusions* were not even "*minimally consistent*" with the *facts of this case*, as we have described at length above.

## B.  Ineffective Assistance of Counsel

In order to establish a claim for ineffective assistance of counsel, a petitioner must demonstrate that: (1) his attorney's performance fell below an objective standard of reasonableness; and (2) the attorney's deficient performance actually prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the "prejudice" prong of the *Strickland* test, the petitioner must demonstrate that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.*

### 1.  The Objective Reasonableness of Counsels' Actions

Attorneys have a professional obligation to conduct "*reasonable investigations* or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691 (emphasis added). The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland*, 466 U.S. at 690). "Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, [the Supreme Court has] noted that 'counsel has

a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Id.* (quoting *Strickland*, 466 U.S. at 691).

"Review of the first prong [of the *Strickland* test] contemplates deference to *strategic decision making . . . ."* *Williams v. Washington*, 59 F.3d 673, 679 (7th Cir. 1995) (emphasis added). Ordinarily when an attorney articulates some strategic reason for a decision, we will defer to that choice. *Strickland*, 466 U.S. at 690-91; *Stewart v. Gramley*, 74 F.3d 132, 135 (7th Cir. 1996); *Montgomery v. Petersen*, 846 F.2d 407, 413 (7th Cir. 1988). At the same time, we realize that it is not the role of a reviewing court to engage in a *post hoc* rationalization for an attorney's actions by "construct[ing] strategic defenses that counsel does not offer" or engage in Monday morning quarterbacking. *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990).

It is often times a reasonable exercise of professional judgment to limit or terminate further investigation when counsel determines that a particular investigation would be fruitless. *See Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997). On the other hand, where "it will be apparent from the evidence concerning the circumstances of the crime, from conversation with the defendant, or from other sources of information not requiring fresh investigation, that the defendant has some mental or other condition that will repay further investigation . . . then the failure to investigate will be ineffective assistance." *Stewart*, 74 F.3d at 135; *accord Brewer v. Aiken*, 935 F.2d 850, 857-58 (7th Cir. 1991). "This does not mean that only a scorch-the-earth strategy will suffice, *but it does mean that the attorney must look into readily available sources of evidence*." *Hall*, 106 F.3d at 749 (emphasis added). In our assessment of counsel's actions, we evaluate counsel's conduct from the perspective at the time the decision was made to forgo the investigation. *See Williams*, 59 F.3d at 680.

"Where the record establishes that counsel had reason to know, from an objective standpoint, *that a possible defense, such as insanity, was available, failure to investigate fully can constitute ineffective assistance of counsel.*" *Jones v. Page*, 76 F.3d 831, 841 (7th Cir. 1996) (quotation omitted) (emphasis added). Further, we have previously held that it *may constitute ineffective assistance if, without a legitimate explanation, counsel fails to pursue a competency hearing when counsel has a reasonable belief as to the client's competence to stand trial, especially when that attorney initially acts upon that belief by requesting an investigation into the client's mental health. Matheney*, 253 F.3d at 1040.

The Illinois Appellate Court, in its August 31, 1999 order affirming the trial court's dismissal of Brown's second post-conviction petition, somehow, someway characterizes <u>*Kozlowski's and Palmer's lack of action in obtaining Brown's medical records as a conscious, tactical stratagem that an investigation of his past history of psychiatric problems would not be beneficial to his defense or of use at sentencing.*</u> The court <u>*surmises that Kozlowski's and Palmer's performances were objectively reasonable because, under the circumstances, "there was no compelling basis or reason for counsel to further investigate defendant's mental condition*</u>," despite these facts: *(1) Kozlowski had been informed that Brown had received treatment for mental illness while he was at Menard; (2) Kozlowski had told the court there was "certainly an issue of sanity" in Brown's case and that she had "questions" about Brown's competency because of the difficulty she had communicating with him and because of the incident in which Brown had yelled at her law clerk; (3) Kozlowski knew she had not received Brown's mental health records that she had requested from Menard; (4) Palmer, Brown's other public defender, had observed first-hand Brown's uncontrolled and irrational outburst at trial; (5) Palmer had moved for a psychiatric*

*evaluation shortly after the trial's completion; and (6) Palmer knew or should have known that Brown's record reflected his two-year confinement in the Menard psychiatric unit while being treated for chronic schizophrenia.*

The Illinois Appellate Court pointed to several factors to support its ruling: (1) Kozlowski's statement in her affidavit that Brown had been cooperative, coherent, and not delusional in his dealings with her; (2) Kozlowski was unaware of "the specific nature of any problem" with Brown's mental health; (3) there was "no evidence" that Brown had experienced mental problems since his release from prison; and (4) Palmer had averred that Brown was "lucid and coherent at all times" [sic]. In reasoning that there was nothing to alert Kozlowski or Palmer to Brown's mental illness, the Illinois court *makes no mention* of the following incontrovertible facts:

(1) Kozlowski had been specifically informed by another attorney who had formerly represented Brown (*i.e.,* Geraghty) that Brown had been diagnosed as suffering from a mental illness (chronic schizophrenia);

(2) Kozlowski had been informed by this same attorney that Brown had once been found "unfit for trial" and that Brown had been taking "large doses" of antipsychotic medication to treat his chronic schizophrenia;

(3) Kozlowski had informed the trial court of her own perception, based on her own "difficulties" she had communicating with Brown and that he had "yelled at [her] law clerk," that she had realized that there was "something different" about Brown and that there was "certainly an issue of sanity" in Brown's case;

(4) Kozlowski had secured a court order for Brown's medical records from the psychiatric unit at Menard but had failed to follow up on this subpoena and discover the reason it had not been complied with;

(5) Palmer witnessed Brown's bizarre and uncontrolled outburst at trial, and thought enough of it to raise it as an issue before the judge at sentencing; and

(6) Palmer either knew or should have known about Menard's inaction on the subpoena from Kozlowski, his colleague and fellow public defender.

Based on the record before us, we are convinced that the Illinois Appellate Court's application of *Strickland* to the facts of Brown's case was not only unreasonable, but also inaccurate. Indeed, the Illinois court's conclusion is not only incompatible with the record before us, but a reasonable reading of the transcript reveals that *precisely the opposite* is true. The record is replete with facts that establish that Brown's counsel made a strategic decision to *initiate* an investigation into Brown's psychiatric condition: (1) Kozlowski represented and emphasized to the trial court that "*there was certainly an issue of sanity*"; (2) she was informed by Brown's former counsel (a Northwestern University Law School faculty member) that he not only had a history of psychiatric problems and treatment, but had once been found unfit to stand trial; (3) she had difficulty communicating with Brown during the pretrial period; (4) she requested a continuance, on the morning Brown's trial was scheduled to commence, so that she could investigate Brown's psychiatric history; and (5) she subpoenaed Brown's prison medical records and thereafter received a court order to compel the production of Brown's psychiatric records. The Illinois Appellate Court for some reason saw fit neither to give us the benefit of its reasoning or to refer to the unfortunate case history discussed above in its conclusion that Kozlowski made a strategic decision that an investigation into Brown's mental health would be fruitless.

Attorneys have an obligation to explore all readily available sources of evidence that might benefit their clients.

*Hall*, 106 F.3d at 749. In the case at hand, both Kozlowski and Palmer had "readily available sources" of information (*e.g.*, Brown's medical records) that would have established that Brown had been, on two separate occasions, previously diagnosed as suffering from a serious psychiatric illness, chronic schizophrenia, that caused him to hallucinate and suffer from delusions of paranoia. We have held in the past that *where a defense attorney has received information from a reliable source that his client has had a history of psychiatric problems, but failed to adequately investigate this history, counsel failed to provide effective assistance. Brewer v. Aiken*, 935 F.2d 850, 857-58 (7th Cir. 1991); *Eddmonds v. Peters*, 93 F.3d 1307, 1325-26 (7th Cir. 1996) (Flaum, J. concurring). At least six of our sister circuits have arrived at the same conclusion. *See Seidel v. Merkle*, 146 F.3d 750, 755-56 (9th Cir. 1998); *Williamson v. Ward*, 110 F.3d 1508, 1517-18 (10th Cir. 1997); *Antwine v. Delo*, 54 F.3d 1357, 1367-68 (8th Cir. 1995); *Genius v. Pepe*, 50 F.3d 60, 61 (1st Cir. 1995); *Bouchillon v. Collins*, 907 F.2d 589, 597-98 (5th Cir. 1990); *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989); *Hooper v. Garraghty*, 845 F.2d 471, 474-75 (4th Cir. 1988); *Profitt v. Waldron*, 831 F.2d 1245, 1248-49 (5th Cir. 1987).

We are convinced that it was abundantly clear from the evidence in the record and available to Brown's attorneys at the time of trial that Brown had more than a mere exposure to mental health professionals, but rather had a prolonged and documented history of severe mental illness, even to the point of necessitating confinement from 1986 through 1988. Thus, they had a professional obligation to do an in-depth investigation into their client's deep-seated psychiatric problems. Even though they might not have known the precise nature or clinical diagnosis of Brown's illness, both of Brown's public defenders certainly had a legal and an ethical obligation to explore and investigate completely the nature and extent of his

illness, not to mention the reasons why the prison had failed to send Brown's medical records. It is clear that at least *Kozlowski had actual, and not simply constructive, notice*—from more than one source—of the *possibility that Brown had been suffering from psychiatric illness both from her interaction* with him as well as the *information* she gained *from her conversation with Geraghty*. Indeed, *Kozlowski* informed the court that *she had difficulty communicating with her client and that her own law clerk had been "yell[ed] at" by Brown*. Based on the totality of her knowledge of Brown's mental condition, Kozlowski represented to the state trial court that *she believed Brown's mental condition was a serious enough issue that she certified to the court in her statement that there was "certainly an issue of sanity."* In addition, she explicitly expressed concern to the trial judge that Brown may have been "off his medication . . . at the time the [robbery] occurred." Finally, as we have made abundantly clear in Part I, *ante*, Kozlowski believed Brown's mental condition to be of sufficient importance and of such severity that she saw fit to place her credibility on the line with the state trial court by requesting (and receiving) a continuance for further investigation on the morning the case was originally set for trial. Similarly, Palmer believed Brown's mental condition was enough of an issue to raise it, albeit halfheartedly, before the sentencing judge.

Despite these legitimate concerns, neither Kozlowski nor Palmer saw fit to speak to Brown's family about his past history (of possible crimes, mental illness, or educational background, for instance), much less conduct a further investigation that would certainly be considered reasonable under the circumstances. Brown's attorneys requested by subpoena his medical records from Menard and thereafter proceeded to trial without this information nor inquiring why Menard had not complied with the

court's order. Kozlowski's affidavit offers no explanation as to why, after expressing her sincere concern about her client's condition in open court regarding his sanity to the trial judge and subpoenaing his medical records, she proceeded to abandon her interest in the medical records.

The Illinois Appellate Court, in an attempt to justify Kozlowski's inaction, points to her affidavit that stated that she believed Brown "at all times . . . was lucid and coherent." Kozlowski's self-serving affidavit, submitted long after the trial and after Brown had subsequently filed numerous challenges to his conviction alleging that her representation was ineffective and therefore a violation of his constitutional rights, is _not worthy of any credence because it is contradicted by the record detailing her on the record statements and lack of action during her inadequate representation of the defendant_. For example, Kozlowski's unconvincing statement that Brown was "_at all times . . . lucid and coherent_" fails to shed any light upon the question of why she failed to follow through with the investigation she launched to a conclusion. Furthermore, she fails to explain why she went so far as to represent to the trial judge that she had trouble communicating with him and stated that he had yelled at her law clerk. If we are to put credence in Kozlowski's affidavit that she truly believed Brown was "at all times . . . lucid and coherent," why did she urge the court to delay the trial in order that she might obtain his medical records so that she could address the "certain[ ] . . . issue of sanity"?

In its attempt to justify Palmer's inaction, the Illinois Appellate Court actually _attributes Kozlowski's statement to Palmer_. In the order dated August 31, 1999, affirming the trial court's dismissal of Brown's amended post-conviction petition, the court wrote that Palmer swore in his affidavit that Brown was "lucid and coherent at all times." Palmer was considerably more circumspect in his affidavit, stating only that Brown was "lucid and coherent at all

times *during my conversations with him.*" We cannot support the conclusion of the Illinois Court of Appeals—on the critical issue of what Brown's attorneys knew about his mental state and when they knew it—as it is based on faulty information, provided by Brown's own public defender lawyers.

Based on the record before us, we are compelled to conclude that counsel's performance in the case before us was deficient. Kozlowski had knowledge from a very reliable source—a Northwestern Law School professor who had previously represented Brown—that her client had received treatment for a mental illness, including large doses of anti-psychotic medication. Counsel also had reason to believe that based on a comparison of the victim's and the defendant's versions of events (in the police statements at trial) that he might have suffered from paranoia and hallucinations at the time of the crime from his recounting of the episode. Finally as was made clear in Part I, *ante*, both Kozlowski and Palmer represented to the judge that they believed that insanity was a potential defense or mitigating factor.

Despite these concerns, counsel inexplicably abandoned their investigation and *failed to articulate any strategic reason for the abandonment of the investigation* into Brown's mental history. There is no evidence in the record that either public defender subsequently spoke with Brown's family members (about his mental health history or education) or his treating or examining doctors. We conclude that this failure to investigate adequately and discover Brown's documented history of schizophrenia and treatment fell below an objectively reasonable standard of performance. Indeed, Kozlowski's abandonment of her client's interest was exemplified by her failure to: (1) follow through on the investigation that she initiated; (2) provide her replacement counsel with even the barest of details regarding Brown's mental condition; or (3) en-

ter a defense of not guilty by reason of insanity. Similarly, Palmer's failure to demand action on the subpoena and to renew his request for a second psychiatric examination after Brown's courtroom outburst certainly fell below an objectively reasonable standard of performance. Kozlowski's and Palmer's lack of diligence more than demonstrates that Brown was not represented in a professionally competent manner. We hold that the Illinois Appellate Court's contrary conclusion is an unusual and an unreasonable application of *Strickland* to the facts of this case.

2. Prejudice

Having found that the performance of Brown's counsel was deficient, we turn now to whether Brown was prejudiced by the error. In order to establish that he was prejudiced by counsel's failure to investigate his mental condition, Brown must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Brown's argument is that the failure of his trial counsel to supply the court and court-appointed psychiatrists with available documentation of his psychiatric illness prejudiced his defense by providing the trial judge with less than reliable information, thereby contributing to the trial judge's rendering a finding of law based on inaccurate conclusions regarding his competency and sanity. We are at a loss to understand the Illinois Court of Appeals' stated reasoning that "*[e]ven if defense counsel had obtained the prison records, it does not appear there is a reasonable probability the result of the proceedings would have been different . . . [because] [t]here is . . . no evidence that if Dr. Kaplan had reviewed the records, he would have altered his fitness finding*" (emphasis supplied). We

are well aware that a person suffering from chronic schizophrenia may have certain periods of lucidity and thus appear perfectly normal at one moment while suffering from delusions of paranoia or hallucinating at another. Indeed, it is the imprecise and imperfect nature of the science known as psychiatry that makes a review of the past available psychiatric records *an essential part* of an evaluation of a defendant's competency to stand trial. *See, e.g.*, Randy Borum & Thomas Grisso, *Establishing Standards for Criminal Forensic Reports: An Empirical Analysis*, 24 Bull. Am. Acad. Psychiatric & L. 297 (1996) (psychiatric history is an "essential" element in a competency evaluation); Daniel W. Shuman, *Psychiatric & Psychological Evidence* § 11.08 (2d ed. 2001) (sources of information to consider include other psychiatrists or psychologists who have diagnosed or treated the defendant, the defendant's family and friends, etc.); Kirk Heilbrun, et al., *The Use of Third-Party Information in Forensic Assessments: A Two State Comparison*, 22 Bull. Am. Acad. Psychiatry & L. 399 (1994) (the person's mental health history is among the most important sources of third-party information in forensic assessments). The Illinois appeals court, however, failed to explain adequately the basis of its reasoning. We think it is obvious that a psychiatrist's diagnosis, especially when dealing with a chronic schizophrenic, must necessarily rely heavily on the patient's past psychiatric history, family history, criminal activity, *and medical records. See, e.g., Drope v. Missouri*, 420 U.S. 162, 180 (1975); *Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994).

The Illinois Appellate Court's analysis is summary in nature, in that it fails to provide sufficient explanation for its conclusion, and we are convinced that the Illinois court's cursory dismissal of Brown's argument is a most unfortunate and an unreasonable application of the *Strickland* prejudice standard. Dr. Kaplan based his opinions on but one single interview with Brown, his review of

Dr. Rabin's similarly inadequate report, and his review of the police report documenting Brown's arrest. Neither Dr. Kaplan nor Dr. Rabin saw fit to interview and have the benefit of the observations of Brown's family members (unlike Dr. Ferrell), let alone the unequivocal opinions of two psychiatrists, one of whom had treated Brown for a period of nearly two years, that Brown had been *diagnosed with chronic schizophrenia and suffered from symptoms that included auditory hallucinations and paranoia.*

We are convinced that the glaring absence of even a minimal investigation into Brown's medical history clearly affected the validity and thus the utility of the findings of the Psychiatric Institute doctors. The doctors there failed to investigate Brown's assertions of claims of mental illness in order to be able to corroborate them or cast them aside. Though his case history was lacking, the examinations submitted to the court *mistakenly suggest that Brown was someone who made a fictitious claim of suffering from mental illness, when in fact Brown had a long-standing, well-documented history of suffering from chronic schizophrenia.* These conclusions are unsubstantiated, unaccompanied as they were by the readily available documentation of Brown's psychiatric history. Certainly a prudent psychiatrist, in the proper exercise of his professional obligations to conduct a thorough mental exam, would have obtained and reviewed the opinions of the two other examining psychiatrists who had evaluated Brown, and perhaps at least spoken with Brown's family members (as did Dr. Ferrell) to evaluate whether he had a history of acting out. It is reasonable to assume that Dr. Vallabhaneni's diagnosis of Brown as suffering from chronic schizophrenia, including symptoms of paranoia and hallucinations, would have shed light upon the bizarre set of facts surrounding the crime (in which Brown believed he was being followed by the victim and was about to be assaulted by him) and thus affected Dr. Kaplan's

diagnosis. Dr. Vallabhaneni's diagnosis would certainly have helped to explain Brown's conduct and demeanor with his counsel Kozlowski, Palmer, and the court itself. In short, we are convinced that Dr. Kaplan's lack of information concerning Brown's medical history renders his opinions on Brown's competency and sanity useless and unreliable.

Similarly, because of the failure of attorneys Kozlowski and Palmer to discover and to bring Brown's mental problems and medical history to the court's attention, his trial and sentencing hearing were conducted without the benefit of the knowledge of the severity of his mental condition. *See Drope*, 420 U.S. at 176-77. In the case before us, the trial judge's comments during sentencing reveal the prejudice that flowed from Brown's attorneys' failure to provide the court with evidence of his schizophrenic history and the incomplete report provided by the probation officer. The trial judge went so far as to describe Brown as a "pathetic individual," who "could have overcome" his "pathos" "a long time ago" if he had "made some effort" to do so. The judge further stated that Brown had "virtually no hope for rehabilitation," and sentenced him to the maximum term of imprisonment permitted under Illinois law (30 years).

We disagree with the *Illinois Appellate Court's conclusion that Brown suffered no prejudice from counsel's error*, for we are of the opinion that the *prejudice is clear and readily apparent*. Because of *Brown's attorneys' failure to present evidence* of his *mental condition*, the court admitted, *without even a whisper of an objection from counsel*, the finding of *Dr. Kaplan* that *Brown was competent to stand trial and sane at the time he committed the crime*. It should be pointed out that Brown's trial attorney (Palmer) had ample opportunity to make a record of insisting upon a competency hearing had he presented evidence (as the attorneys from the Northwestern

Legal Clinic have properly seen fit to do) that Brown had in the past suffered and probably was now suffering from chronic schizophrenia, along with symptoms of paranoia and hallucinations, and that he had also evidently failed to take medication to remedy his condition for at least two years. Illinois law requires that courts conduct competency hearings whenever "a bona fide doubt of the defendant's fitness is raised." 725 Ill. Comp. Stat. 5/104-11. Certainly the medical records confirm Brown's medical problems, and those records would raise a "bona fide doubt" regarding his competence. Further, Brown's attorneys might very well have found it probable (and certainly had an ethical and legal obligation to explore this possibility)[8] to prevail on an insanity defense, given Dr. Ferrell's conclusion that "all decisions Mr. Brown made while off his medication should indeed be viewed as the decisions of an irresponsible, unreasonable, and illogical man."

We understand that psychiatry is an imperfect science at best. However, *Strickland* does not require absolute certainty—it only requires a probability sufficient to undermine confidence that the result of the proceeding is reliable. *Strickland*, 466 U.S. at 694. The failure of the public defenders, the doctors, the probation officer, and the state courts in the handling of this case of an indigent and mentally ill defendant not only "undermine[s] confidence" in the reliability of the result; it might well signal a system that is in need of review and repair. Given Brown's extensive and well-documented battle with chronic schizophrenia, as well as Dr. Ferrell's report characterizing *Brown's crime as demonstrative of a "lack of logical, cohesive thinking" and the product of "the thought-distorting effects of schizophrenia," we refuse to*

---

[8]  Rule 1.3 of the Illinois Rules of Professional Conduct requires lawyers to "act with reasonable diligence and promptness in representing a client."

*countenance the appellate court's conclusion that the result of Brown's trial "would not have been different"* had trial counsel taken the minimal time to secure his mental health records and properly inform the court of Brown's condition.

We conclude that Brown was prejudiced by his counsel's failure to investigate (*e.g.*, talking to his family, securing his prison medical records), to request a hearing to determine his competency to stand trial, and to consider seriously the question of whether to enter a plea of not guilty by reason of insanity. The Illinois Court of Appeals' decision to the contrary is an unreasonable application of the *Strickland* standard.

## IV. CONCLUSION

This case is a striking example of a legal system that processed this defendant as a number rather than as a human being; it signals a breakdown of a process that might very well be in need of review, adjustment, and repair. Brown's psychiatric illness was not given so much as a sideways glance by the parties involved. Not only did Brown's public defender trial attorneys drop the ball; so did the court-appointed mental health doctors (a psychologist and a psychiatrist) and probation officer, all of whom failed to conduct even a sufficient inquiry into his family background and extensive medical history. As a result, the state trial court proceeded without any awareness of his condition. We have a record before us that mandates—in the interest of justice—the conclusion that Brown was denied his Sixth Amendment right to effective assistance of counsel on the grounds that his counsels' failure to investigate his history of mental illness prejudiced the outcome of his trial. In so doing, we find it unnecessary to address Brown's claim that he was denied his Fourteenth Amendment due process right because he

was tried and convicted when he was not competent to stand trial.

We REVERSE the decision of the district court and REMAND with directions to GRANT the writ of habeas corpus unless the State of Illinois elects to re-try Brown within a reasonable time to be fixed by the district court.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*