NOTICE
Decision filed 03/03/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 200381-U

NO. 5-20-0381

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 19-CF-280 |
| | ) | |
| RICKY RICHARDSON, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1     *Held*: Defendant's conviction and sentence are affirmed where the record fails to support the existence of a *bona fide* doubt of defendant's fitness to stand trial and defendant was not denied effective assistance of counsel at any stage of the proceedings.

¶ 2     Following a jury trial, defendant, Ricky Richardson, was convicted of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(1) (West 2018)) and unlawful use of a weapon by a felon (*id.* § 24-1.1(a)). He was subsequently sentenced to 14½ years' incarceration in the Illinois Department of Corrections (IDOC) for the aggravated discharge of a firearm conviction to run concurrent with a sentence of 8 years' incarceration in IDOC for unlawful use of a weapon by a felon. Defendant appeals, arguing (1) his due process rights were violated where neither his counsel, nor the court, ordered a fitness examination; (2) his trial and sentencing counsel were ineffective by failing to

1

investigate the severity of his mental disabilities; (3) his trial counsel was ineffective for failing to sever the charges prior to trial; and (4) his sentencing counsel was ineffective for failing to raise the issue of trial counsel's ineffectiveness before or after sentencing. For the following reasons, we affirm defendant's convictions and sentences.

¶ 3                                    I. BACKGROUND

¶ 4     Following an incident on June 24, 2019, defendant was charged, by information on June 28, 2019, with aggravated discharge of a firearm at a building (*id.* § 24-1.2(a)(1)), aggravated discharge of a firearm in the direction of an occupied vehicle (*id.* § 24-1.2(a)(2)), and unlawful use of a weapon by a felon (*id.* § 24-1.1(a)). An arrest warrant was issued for defendant, who was apprehended in Tennessee on July 17, 2019. Defendant returned to Jackson County, Illinois, on July 24, 2019, and appeared in court on July 26, 2019. At that time, he was advised of his rights, the nature of the charges, and the possible penalties, and counsel was appointed.

¶ 5     On August 20, 2019, defendant filed a motion to dismiss claiming he was not provided his statutorily required preliminary hearing pursuant to section 109-3.1(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/109-3.1(b) (West 2018)), because he had been incarcerated since July 17, 2019. The motion proceeded to hearing on August 22, 2019. At the beginning of the hearing, defendant advised the court that he wanted to speak. The court admonished defendant of his rights and encouraged defendant to speak to his counsel outside of court. Defendant stated that he still wished to speak but agreed to wait until the motion to dismiss was addressed.

¶ 6     Following arguments by his counsel and the State, defendant again stated he wanted to speak. The court again admonished defendant of his right to remain silent, but stated if defendant was going to speak, to not admit anything about the details of the case. The court again reminded defendant that his lawyer was there to speak for him and represent him, but the court was not going

2

to stop him from talking. Thereafter, defendant stated that he felt like he was being "railroaded" because the pending charges did not fit the crime listed in the police report. The court stated it did not want to get into detail about that; however, defendant reiterated his initial complaint and stated:

"Like, I'm a nervous wreck right now. *** I've been incarcerated and, like, my mental state is, like, not on point right now because I feel like I'm being railroaded.

But Mr. Ting read my police report to me[,] and all the charges does not fit. I feel like somebody need to read the police reports and look at the law book again, and there's been some tampering with evidence in this case."

¶ 7    The court stopped defendant, stating it appreciated what he was saying but reminded defendant he had an attorney, and his attorney could file any motions that were appropriate. Thereafter, defendant reiterated the complaints stating, "I thought I should get this on the record." After the court informed defendant that his attorney would assist him with the reports, discovery, any offers, and defense preparation, defendant stated, "I just hope I'm not being railroaded."

¶ 8    Thereafter, the court denied the motion to dismiss stating the 30-day period began when defendant arrived at the Jackson County jail, the period had not yet expired, and set the matter for a preliminary hearing. Defendant then stated, "I talked to Antonio Graham. He said he's not coming to court anyway." The court advised defendant to talk to his attorney. Thereafter, defendant's attorney stated, "for the record," he had already visited defendant twice and would continue to do so. Defendant stated, "I'm being railroaded."

¶ 9    The preliminary hearing was held on September 3, 2019. Carbondale Police Officer Jonathan Arenas testified that he was dispatched to 1213 North Bridge Street due to a shots-fired call on June 24, 2019. At that time, he spoke with Antonio Graham who stated defendant drove up in a Chevrolet Impala with Tennessee license plates, pointed a gun at him, and threatened to kill

him while he was working. Mr. Graham explained that defendant previously dated his sister. After defendant's visit to his job, Mr. Graham went to his mother's house at the above-stated address to check on her. As he was leaving her residence in his car, defendant pulled up to the corner in the Impala, pointed the gun, and fired in his direction. The bullet hit the house, not the car. The officer testified that he also spoke to Michael Blankenship, the landlord of the property, who advised him the hole in the home's siding was new. The hole was fist sized and the officer believed it came from a .22-caliber weapon. Mr. Graham advised the officer that the slide fell off defendant's gun. Mr. Graham retrieved the slide and provided it to the officers.

¶ 10 Officer Arenas further testified that another officer saw defendant drive by, in the opposite direction, in a black Chevrolet Impala and defendant waved at the officer. That officer turned around, but the Impala sped away. Officer Arenas testified that the car was eventually found a few hours later. Upon opening the door, a spent .22-caliber shell casing was found on the driver's side armrest. It was photographed, left in place, and the vehicle was towed to the Carbondale Police Department. Thereafter, the officers applied for a search warrant, which was granted. The next day the vehicle was searched, and the .22-caliber shell casing was taken into evidence.

¶ 11 Officer Arenas also testified that detectives spoke with other employees at Mr. Graham's employment who confirmed the make and model of the vehicle seen the previous day when they witnessed the interaction between defendant and Mr. Graham. Following the testimony, the court found probable cause to hold defendant for further proceedings. Defense counsel waived the formal reading of the charges, pled not guilty to each count, and requested a jury trial setting.

¶ 12 On September 24, 2019, defense counsel moved for a bond reduction, which was granted. The case proceeded on a status hearing on October 21, 2019. At that time, defense counsel requested a hearing regarding the admissibility of evidence prior to trial. Twice during counsel's

statements, defendant interrupted stating, "I don't want no continuance." The second time he also stated, "I am ready for trial." After the second interruption, defense counsel asked his client to allow him to speak. After the court intervened, defendant stated, "Pushing for trial, sir. No continuance." After counsel completed his request for the hearing, defendant again stated, "I feel like I'm being railroaded, Mr. Judge." The court responded, "Railroaded? You just indicated you wanted a trial." Defendant responded, "I want a trial." The court informed defendant, "We are going to have it, but next we are going to have motion hearing on Wednesday morning." Defendant then asked what the motion hearing was for, and his counsel replied, "For the additional discovery material that I received today which I spoke to you about in court before your case was called." Defendant stated, "I'm ready to go to trial. What do we need a motion for? I don't understand. That's what I am asking. He didn't talk to me." The court stated the motion "may affect what is admissible during trial" but they would deal with it on Wednesday morning. Thereafter, defendant stated, "My trial date is set for next week on Monday" and the court said, "Correct." Defendant stated, "My 120 days is almost up." The court replied, "Your case will be tried prior to that time, sir." Defendant responded, "Thank you, sir."

¶ 13     The State filed a motion *in limine* on October 22, 2019, and defense counsel filed a motion *in limine* and *Montgomery* motion on October 23, 2019. The motion hearing was held on October 23, 2019. Following arguments, which explained how defendant and Mr. Graham came to be at odds and addressed numerous text messages, phone calls, and photos that were sent between defendant and Mr. Graham, the court allowed the evidence contained within the State's motion to be admitted. Thereafter, the court stated the trial would be held as previously scheduled.

¶ 14     Following the court's ruling, defense counsel stated:

5

"I just want to make the record as clear as possible, [defendant] was furiously scribbling, writing notes to me during the course of this hearing. He's indicated at least two witnesses that could possibly testify on his behalf. This is the first time I have ever heard about these witnesses or what they could potentially testify to. I obviously have not disclosed this to the State because I was just made aware of this. ***

I informed [defendant] there is no way that I can *** obtain information from these witnesses and be able to disclose them and provide the State sufficient time to prepare their cross examinations based on this evidence without continuing this case. *** I would ask the Court to make a very clear inquiry ***. If he wants a continuance, I can do my best to attempt to try to locate this evidence."

The court, after noting defendant's prior statements that he did not want any continuances, asked defendant if he wanted counsel to request a continuance. Defendant responded by stating:

"Yeah, I want to request a continuance, and I also want to say that I want to apologize to my attorney because I just got out of prison and I'm kind of mentally disabled due to the fact that, you know, what's going on, I haven't even got a chance to adjust into reality. I just did eight years in prison. I only been home a year."

¶ 15    The court responded:

"All right. You've always responded to questions in court, answered my questions appropriately. I've had no problem at all understanding you and communicating with you, and for the record, [defendant] has always been able to communicate back to me in a responsive fashion. I've noted no issues along those lines."

After acknowledging defendant's apology, the court twice more asked defendant if he wanted a short continuance and defendant confirmed both times that he did. Defendant then advised the

court that he wanted to speak with the Carbondale police to press charges against Antonio Graham for murder for hire. After admonishing defendant that such request was not within the court's power, the court set the case for trial on December 2, 2019.

¶ 16    On November 15, 2019, the clerk filed correspondence from defendant to the court stating that defendant wished to fire his attorney and request a different public defender. At a status conference on November 18, 2019, defendant advised the court that he wished to speak. The court admonished defendant about speaking to the court and encouraged him to speak with his counsel. Defense counsel advised the court of the status of the additional witnesses, defenses, discovery— which included evidence obtained from the State regarding defendant's phone calls at the jail, as well as defendant's desire for different counsel. Both parties then advised the court they were ready to proceed to trial on December 2, 2019.

¶ 17    Thereafter, the court again admonished defendant about speaking in court. Defendant then proceeded to complain about his counsel's "provoking and antagonizing" statements regarding the evidence stating defendant left his meeting with counsel because he believed his counsel was being unprofessional. Defendant then stated:

> "So[,] by me going through what I'm going through *** I been going to ask for a mental evaluation, but I haven't had time to ask for a mental evaluation because Mr. Ting has been antagonizing me. Instead of trying to help me, he's been antagonizing me and throwing things in my face."

¶ 18    Defendant accused his counsel of telling the state's attorney, "I'm going to give him to you." Thereafter, defendant complained that his counsel would not file a motion to dismiss "because they had no evidence, no DNA factors, [and] tampering with evidence." Defendant later stated that his counsel was "antagonizing" him because he knew "that I have a mental problem"

7

and was "upset." Defendant further expressed his displeasure with his counsel listening to his phone calls with the State and claimed counsel told his sister, "Yeah, I think your brother is guilty, and he's gonna get a whole lot of time and I'm gonna help him get a whole lot of time."

¶ 19   Defendant stated that he had an attitude because "I know for a fact I didn't do what they're charging me with" and his counsel was "taking my attitude in the wrong manner." He stated that his mental state was messed up due to conditions in the prison from which he was recently released and the death of his unborn son. He claimed his attorney was "playing off that, and I don't know why." Defendant requested a different public defender and stated, if he was denied, he would ask his family to hire an attorney. He stated his current counsel was "unbearable" because he would rather "rub the State's evidence" in his face than be his public defender; he further stated that he provided the names of the proposed witnesses for his counsel to subpoena.

¶ 20   Defendant then complained that he was threatened with being put in the "hole" at the jail and stated:

> "I feel like I got PTSD due to a lot of things that's been going around me in prison, come home, lose my child, about to lose my best friend if I go to prison. *** I need some help. I'm really not even *** in the right frame of explaining myself. I don't even have a education. If you look at my writing, you can tell that I have mental problem. If you look— if you look at my conversation, what I'm saying out of my mouth, like it's not even detailed of how you put a paragraph together, sir. I got a mental problem, and I would like for you to let my sister talk."

¶ 21   The court denied defendant's request, told defendant that it appreciated what defendant was stating, and asked defendant if he had anything else he wanted to say. Defendant responded by telling the court about conversations he had with his counsel regarding his innocence and the

8

evidence. He also advised the court about his cellmates at the jail and his request to be in a different area away from those cellmates, stating:

"That's all I'm asking until I get a lawyer to get everything resolved with this case because I know for a fact that I'm going home, and the PTSD is just damaging me. It's really damaging me. *** I'm a human being, and my mental state is going down. I just got out of prison, I just lost my son. *** It hurts to know that I'm in jail for something that I didn't even do, and the DNA factors and the tampering with evidence factor show it. I'm asking this Court to dismiss this case. *** That's all I'm asking, sir."

¶ 22     The court responded by stating it appreciated defendant's statements. It then addressed defendant's relationship with his counsel and further advised defendant of the State's and his counsel's roles. The court stated, "It's not Mr. Ting's job to tell you what you want to hear, but to go through the evidence, any potential defenses that you have based upon his experience and talk straight with you about those." Defendant interrupted stating that he called his counsel a "dirty MF" at the jail and, thereafter, his attorney "ran with it and started antagonizing" him stating he was not going to help him. Defendant again requested a different public defender.

¶ 23     Defense counsel then asked to speak to the court. After addressing defendant's prior statements, and his willingness to take defendant's case to trial, defense counsel stated:

"Now, [defendant] is disgruntled. As to his mental illness, I do not believe there's an issue of competency. I spoke to [defendant] several times throughout the course of his case. I do not believe that he is currently mentally unfit to stand trial, and I do not, in my professional opinion, have a *bona fide* doubt as to his sanity at the time of the offense. [Defendant] obviously says he did not commit it, and so his affirmative defense of insanity would not be an offense that can be utilized. *** For the record, *** what I would

9

respectfully request *** [is] the Court to provide [defendant] an opportunity to hire private counsel *** with the delay *** attributed to the defendant [for] *** speedy trial calculations ***."

¶ 24    In response, the State indicated it was ready to proceed and requested that if the trial court granted defendant's request, the continuance be granted for a period of a few weeks at most. Thereafter, defendant again spoke disagreeing that he antagonized his counsel but was concerned because another inmate told him that Mr. Ting played dirty and worked with the State. Defendant also complained that he asked his counsel, five or six times, to file a motion to dismiss due to "tampering with evidence" and a "lack of the DNA" and his counsel said "No." He again claimed that defense counsel told his sister that he was going to jail for a long time because he thought defendant was guilty. He wanted his sister to talk to the court, saying:

"It's like hearsay going back and forth, and that's why I asked for a mental evaluation for PTSD. I have a mental problem. You can check my school records. *** I was in a behavior class, mental health class, and my school records show I don't have a GED or high school diploma. So that's why I'm stating this. It's not because I'm trying to get over on the State. It's not because I'm trying to, you know, go around this case that he's pending on me, it's because it's the truth. I need some help and I'm asking for help."

¶ 25    In response, the court stated, "Mr. Richardson, *** you've been able to communicate in each court hearing that we've talked and expressed intelligent thoughts, and so the Court has no concerns at this point in time about your—any doubts of fitness to stand trial or anything else along those lines." Thereafter, the court addressed defense counsel's judgment regarding which motions to file and which witnesses should testify. The court denied the motion to continue but stated if defendant hired private counsel, they would revisit the issue. Defendant interrupted and asked if

10

he could tell the jury that he did not want Mr. Ting on his case. The court responded by telling defendant that either Mr. Ting or private counsel would represent him during the trial, and they would "do the talking to the jury and bring out the evidence and cross examine witnesses, things of that nature, give opening statements." Defendant interrupted the court, asked about the subpoenas for his witnesses, and again complained about his counsel. The court recommended defendant work with his attorney and denied the requested continuance.

¶ 26    The parties returned on December 2, 2019. Defendant advised the court that he wished to proceed to jury trial or have his case dismissed. The court explained to defendant the decisions he would make and the decisions his attorney would make. After receiving confirmation from defendant that he understood, the parties reargued the State's motion *in limine* and the defense's *Montgomery* motion. The court stated it would reserve its ruling until the following day due to defense counsel's request to research a revocation issue. Thereafter, the court read the charges to defendant along with the potential penalties associated with each count. Following each count, defendant stated he understood the charges and potential penalties.

¶ 27    Prior to jury selection, defendant made numerous complaints about his defense counsel, stating that he did not contact the witnesses and again claimed he was being railroaded. Counsel disagreed. Defendant stated he did not want Mr. Ting as his counsel. Mr. Ting advised the court that he spoke with both potential witnesses, which included defendant's sister and girlfriend, and neither wanted to testify. Thereafter, both potential witnesses personally told the court that they did not wish to testify.

¶ 28    After the first round of *voir dire*, defendant asked about the jurors and the challenges. He again stated he did not want Mr. Ting as his attorney. He stated there was a conflict of interest because the attorney was arrogant. He then stated:

11

"I don't understand the law because this is my first time ever going to trial in my life, and Mr. Ting knows this. Mr. Ting also knows I said in court the last time that I have a mental problem. But Mr. Ting [said], 'Oh, he don't have a mental problem.' So how do I *** prove there's something wrong with me when neither the Court's going to give me the opportunity for a mental evaluation?"

¶ 29 The court responded, "We are here currently today. The trial has started. The Court's made the pretrial findings." The court encouraged defendant to talk to his lawyer about the first four jurors. Defendant stated that he would "rather walk off" and not attend the trial. The court said that was his choice, but the trial was going forward.

¶ 30 Thereafter, defense counsel accepted the first jurors and defendant stated, "I didn't say that, sir. I didn't honor that. *** I don't understand what's going on." The court indicated defendant's counsel would answer, and Mr. Ting again accepted the first four. Defendant stated, "He can accept. I'm not." Defense counsel again accepted the panel and stated:

"And for the record I have met with [defendant] multiple times. I am aware that at times he has claimed that *** he may have a mental illness[;] his only real mental illness is being incarcerated and he's sick of being incarcerated. I have spoke[n] with him many times. He has a very clear idea of his case."

Defendant interrupted stating, "This man is being aggressive." Counsel continued:

"In my professional opinion I have no *bona fide* doubt as to his competency to stand trial. I believe he understands the nature and purpose of the proceedings as evidenced by various communications with me regarding various motions that he wishes me to file and things of that nature. And he can communicate with his counsel and he has certainly done so. Even today he's communicated with me."

12

Defendant stated, "Man, I can't communicate with him." The court interrupted stating, "The Court's made previous findings and has no doubt about [defendant's] fitness to stand trial even today as we've gone through these procedures and processes." Thereafter, the court continued with jury selection. After addressing the next four, the court brought all the jurors back in. As the jurors were returning, defendant stated, "I don't want him on my case."

¶ 31    The court released the jurors for lunch. Following their departure, defense counsel addressed defendant's statements that he did not want him on the case, as well as defendant's belief that he was being railroaded. Counsel stated that he believed defendant was attempting to poison the jury pool to create an issue he could litigate on review. He asked the court to admonish defendant about the integrity of the court system, not to speak directly to the jurors, and to not speak out of turn unless he was testifying or asked a question directly.

¶ 32    The court asked defendant if he understood and defendant stated, "Yeah, I agree with it. Anybody that's going through something I'm going through, we all humans in here, of course I'm going to speak up and say something. No disrespect." He then complained that Mr. Ting spoke to him like a "drill sergeant." The court advised defendant that the trial would occur with or without him and to communicate with his counsel. Defendant stated he had been "in and out of the hole in the county jail" a total of 75 days out of the 120 days. He also asked the judge to get him "out of the hole in the Jackson County Jail." The court stated that the situation at the jail was in the hands of the jail staff. It then continued with names of the prospective jurors. The remaining *voir dire* was completed, the jury was set, and court ended for the day.

¶ 33    The parties returned the following day with the court first issuing its ruling on the *Montgomery* motion. It stated it would only allow one conviction, the aggravated assault charge,

13

to be used for impeachment purposes. The court denied defendant's motion to reconsider the court's prior ruling on the State's motion *in limine*.

¶ 34    Following the court's ruling, defense counsel asked to make a record, stating:

"[Defendant] now is furiously writing various bits of evidence that he wishes me to produce. Again, obviously as I've stated before, I've tried many, many times to speak to [defendant] regarding his case.

At this point[,] the defense has no witnesses other than possibly Biannca McCrite which I did not have under subpoena[,] and I do not know if she will actually be available to testify. I'm not sure if [defendant] even wants her to testify at this point. But I have done everything to establish due diligence in representing [defendant].

At this point I have no affirmative defenses and no alibi defense. My defense is based on the sufficiency of the evidence that the State will present before the trier of fact. I have tried to speak to [defendant] numerous times, and while he is able to communicate with me, it's just his disagreeable nature, and so it's not a fitness issue.

I also want to document that several family members came to my office this morning. They complained regarding [defendant's] mental capacity and indicated that [defendant] has a very low IQ and that he suffers from mental illness such that a psychological consultation and evaluation should be conducted. As I've previously documented on the record, I have spoken with [defendant] several times. I am aware that he may be afflicted by certainly mental illnesses, but nevertheless I believe his IQ is certainly sufficient to raise itself to the threshold of competency to stand trial.

14

He is able to communicate with his attorney, specifically his desire to have specific things done in this case. So[,] [defendant] is certainly competent to stand trial. I have no *bona fide* doubt as to that. Based on that, your Honor, the defense is ready to proceed."

¶ 35   The court then allowed defendant to speak. Defendant complained about his counsel, saying they were not compatible, and that counsel would not do the actions he wanted. Defendant further stated that he was "not aggressive. I'm fighting for my freedom."

¶ 36   The court acknowledged defendant's statements and stated the jury was set and the case would proceed. Defense counsel stated that defendant's proposed motions could not be legally presented and defendant's displeasure with what he was being told did not mean counsel was not communicating; it only showed that defendant did not respect his decisions regarding trial strategy. Thereafter, the court took a five-minute recess, and the trial began.

¶ 37   The State called Aaron Baril, Rosheka Graham, Antonio Graham, Jack Yates, Michael Blankenship, Anthony Williams, Brandon Kittle, and Jonathan Arenas to testify. Detective Baril testified about the Cellebrite program that retrieves data from cell phones, its use on Antonio Graham's phone, and the report obtained following the data retrieval. He identified the exhibits obtained from the data extraction and those exhibits were admitted.

¶ 38   Rosheka Graham testified about her prior relationship with defendant, including him breaking out the back passenger window of her car after the relationship ended. She stated she was in the car at the time and filed a police report regarding the incident. She further testified that defendant kept making threats and shot out the back window of her brother's car. Antonio Graham testified about the text messages and photos he received from defendant in May 2019, the shooting incident, and the texts he received from defendant following the incident. Jack Yates, Mr. Graham's supervisor, testified about the incident at the workplace and his call to the police

15

department. Michael Blankenship—Mr. Graham's mother's landlord—testified that he heard the pistol shot, heard a car speed off, and called the police. He spoke to police when they arrived about three to four minutes later. He identified the bullet hole in the mother's home.

¶ 39    Anthony Williams, a Carbondale police sergeant, testified that he spoke with Mr. Graham and Mr. Blankenship following the shooting and found the Impala later that evening. Brandon Kittle, a Carbondale police officer, testified about seeing defendant driving the Impala following the shooting and the directive not to pursue due to being in a residential area. Officer Arenas testified about his conversation with Mr. Graham on the day of the incident as well as Mr. Graham's retrieval of the gun slide that was later provided to the officers after the shooting.

¶ 40    The following day, the State called Lauryn Vunetich, Rebecca Mooney, and Greg Rowald as witnesses. Ms. Vunetich worked for the Illinois State Police (ISP) forensic lab and identified the shell casing. Ms. Mooney was a crime scene specialist who testified about the storage and transfer of the shell casing, as well as the swabs from the vehicle. She explained that no DNA testing was performed due to ISP testing policies. Greg Rowald testified that he performed jail transport and picked up defendant in Lake County, Tennessee. He stated defendant told him they had the wrong person, and he did not shoot at anybody. The State rested. The defense moved for a directed verdict, which was denied.

¶ 41    Thereafter, the court addressed whether defendant would testify. Defense counsel advised the court that defendant changed his tone as far as his antagonistic nature and they were in clear communication. Counsel stated defendant vocalized every particular perspective he had regarding witnesses, evidence, and things of that nature during the trial. Counsel continued:

"So[,] I can confidently say *** I have no question regarding [defendant's] decision. It's voluntary, it is not coerced and it is something that he knowingly understands.

16

Again[,] I have no, no question about his mental capacity to stand trial. He has elected not to testify on his own behalf. He recognizes this is his constitutional right and that no one can force or threaten him into any decision in this particular regard. It is his decision and his decision alone."

Counsel further advised that defendant did not want Ms. McCrite to testify, and the defense would have no witnesses.

¶ 42 The court then asked defendant if he wished to testify and he responded, "I don't want to testify, your Honor." Defendant affirmatively stated that he was not forced or threatened into his decision, that he was not under the influence of anything that might affect his ability to make that decision, and further confirmed he understood everything going on. The court further inquired as to Ms. McCrite's testimony. Defendant stated that she had to work, agreed she was not going to be called as a witness, and that he had no witnesses. The court stated:

"And for the record again, we've been through this. I have no concerns about your ability to make these decisions here today. You've communicated well with me throughout all the proceedings and the Court appreciates that, Mr. Richardson. I certainly will find, as I have, that you understand the decisions you're making and what's going on in court today, and I appreciate your communication to me about those things."

Defendant replied, "Yes, sir."

¶ 43 Closing arguments were presented. Following jury deliberations, the jury acquitted defendant of count I but found defendant guilty of aggravated discharge of a firearm (count II) and unlawful use of weapons by a felon (count III). After the jury was excused, defendant asked how many days he had to make an appeal. The court said they would go through all that after sentencing. Defendant said, "Don't I got like 30 days?" The court stated, "Thirty days after the judgment is

17

officially entered or after your sentence in the case, and all post-trial motions." Defendant stated, "All right. I'll be working on a lawyer."

¶ 44    On December 12, 2019, Mr. Ting moved to withdraw and requested an extension of time for posttrial counsel to file a motion for new trial. On December 20, 2019, the court granted the motion and appointed Celeste Korando as defendant's posttrial counsel. On December 23, 2019, defendant filed a *pro se* notice of appeal and posthearing motion. The latter claimed (1) the evidence was insufficient to find guilt, (2) defense counsel did not file the motions or subpoenas he requested, (3) the testimony was inconsistent, and (4) the jury instructions were incorrect. Defendant did not want a retrial; he wanted his conviction overturned and released from custody.

¶ 45    On January 15, 2020, the trial court struck defendant's notice of appeal as not being ripe. On February 24, 2020, defendant advised the court that he was working on finding his own lawyer. On March 25, 2020, defendant filed a motion to dismiss stating there was no fingerprint or DNA evidence, there were no eyewitnesses putting defendant at the scene, he was never in possession of any weapon because he was living in Tennessee at the time of the crime, the police and victim moved the gun thereby tampering with the evidence, and the witness testimony regarding his clothing was inconsistent and his attorney never used that evidence at trial. On March 27, 2020, the trial court dismissed the motions filed by defendant stating the motions had to be filed by defendant's counsel. On April 9, 2020, defendant filed a motion for new trial and requested release or a reduction in bond due to COVID. On April 17, 2020, defendant's counsel filed a motion to reinstate bond, release on recognizance, or reduction of bail, because defendant's incarceration and the COVID restrictions rendered defendant unable to help and aid in the preparation of his defense.

¶ 46 On July 28, 2020, posttrial counsel advised that she still had not received the transcripts. Defendant complained that his new counsel "rolled" him several times and stated he did not "think she would be good" on his behalf because she was running for prosecutor in another county. He further claimed that posttrial counsel told him that if he wrote another motion, she would whip him and take herself off the case. Thereafter, the trial court heard defendant's motion regarding release and bail. Defense counsel stood on the motion, and defendant complained that counsel was not doing her job and he was being railroaded. The State objected to the motion based on defendant's criminal history and the convictions in the current case. The court denied the motion to reinstate bail and reduction of bail.

¶ 47 Thereafter, defendant complained about the State addressing his prior convictions claiming the statute of limitations was up on those crimes which prohibited the State from mentioning them. He further stated the forensic science people proved his innocence and the only thing the court did was pick a "corrupt jury to find me guilty." He continued:

> "Do you hear me? Guilty. Forensic scientists told them and told the Court that I was innocent, hands clean, but you all just keep on, keep on doing me wrong. I am tired of it. I am not crazy. I am not mentally ill or retarded or anything. I am just upset. I take blood pressure medicine now because I am the one here laying in this county jail ***. *** You all are forcing me to do this. You feel me? So that's where my attitude come from. That's where my anger come from. That's where my high blood pressure come from. I would like you to look into this. *** I paid my dues to those crimes, sir ***."

The trial court thanked defendant for his statement and restated the court's ruling.

¶ 48 The parties returned on September 20, 2020. Posttrial counsel advised that she received the transcripts and the last time she tried to visit defendant through video chat he refused to speak to

19

her. She asked the court to set a motion and sentencing hearing. The court encouraged defendant to work with the presentencing investigator as well as his attorney. When the court asked defendant if he had any questions, defendant asked, "Yeah, I was looking up kangaroo court and I started laughing when I was looking up the definition of kangaroo court. I said, oh, man, this is similar to me. Have you ever heard of kangaroo court?" Defendant further stated that he wanted his lawyer to file a "motion to suppress and a motion to dismiss" and complained that his posttrial counsel had not visited him. After posttrial counsel and the State advised they had nothing further, defendant stated, "I want you to know that I wrote the ARDC board on Ms. Korando and I just want to get that on the record ***." The court informed defendant that filing an ARDC complaint would not necessarily remove counsel. Thereafter, defendant stated:

"No disrespect to Ms. Korando. *** This is my freedom here and you know, I have a daughter. I just lost a son[,] and it is, like, too much going on and this right here has just been aggravating and irritating because ain't nobody listening to me. They just listening to other people and they is like trying to make me look bad *** I just come home from prison, like I just did eight years in prison. Now I am going *** to do prison time for something I didn't even do. So that's where my attitude and my anger have come from, you know. I am not depressed. I am not stressed out. It has just been frustrating because nobody listen[s] to me ***."

¶ 49    Defendant's presentence investigation report (PSI) was filed on October 15, 2020. Relevant to the issues on appeal, the report revealed that defendant's father killed his mother and then killed himself when defendant was one month old. Thereafter, defendant resided with his maternal grandmother until he was 18 years old. There were no reports of child abuse or DCFS involvement. Defendant attended high school in Dyersburg, Tennessee, and the Madison County Detention

20

Center in Illinois. Defendant told the investigator that he was enrolled in special education classes in ninth grade because he could barely read or write, which resulted in his learning disability. He stated his reading and writing improved at the Madison County Detention Center. When he was released at age 16, he returned to Dyersburg, Tennessee, and quit school after completing half the school year. Defendant's report card from Madison County revealed A's and B's, with one C.

¶ 50    Defendant self-reported his mental and emotional health as "okay." The PSI noted three prior suicide attempts on June 2, 1998, November 14, 2005, and June 13, 2006. His prior mental health records revealed a diagnosis of dysthymia on May 11, 1998, conduct disorder and learning disorder on June 2, 1998, and adolescent antisocial behavior on September 17, 1998. On March 13, 2000, defendant was diagnosed with oppositional defiant disorder in that he "often lost his temper, argued with adults, actively defied or refused to comply with the requests or rules from adults, deliberately annoyed people, blamed others for his mistakes and misbehavior, and was often angry and resentful." A fitness exam related to a 2002 Jackson County case found defendant was fit to proceed. Similar findings were made for a 2003 Jackson County case. On November 14, 2005, defendant was diagnosed with major depressive disorder, but defendant did not follow up with appointments or medication. Defendant was again diagnosed with depression on June 13, 2006. In a pre-incarceration evaluation dated October 31, 2007, defendant reported no prior treatment for mental health or emotional issues, no prior use of any medications, no feelings of depression or anxiety, and no prior attempts to harm himself. Similarly, no mental illness was noted on April 16, 2008, when defendant reported prior treatment for mental health and depression issues. He was later diagnosed with polysubstance dependence and depressive disorder. On February 26, 2009, defendant was diagnosed with mood disorder and prescribed Zoloft, which he refused.

21

¶ 51 On October 20, 2020, posttrial counsel filed a motion for a new trial claiming defendant received ineffective assistance of counsel and was not proven guilty beyond a reasonable doubt. The posttrial motion and sentencing hearings proceeded on October 21, 2020. With regard to ineffective assistance of counsel, posttrial counsel argued that Mr. Ting's personal comments about being sick as a dog during the trial, and that he was only doing his job, revealed no passion or care for defendant. Counsel further argued that Mr. Ting was ineffective for failing to call a witness for the defense, who left to go to work, by failing to enforce the subpoena against the witness. Counsel further argued that the evidence was insufficient to find defendant guilty as there was no fingerprint or DNA evidence, no physical evidence linking defendant to the scene of the crime, or the gun slide, and the only witness was not credible. Following the State's response, the trial court denied the motion for new trial and the matter proceeded to sentencing.

¶ 52 Defendant's statement in allocution included an allegation that Mr. Ting told him "they are going to railroad you" by threatening to provide copies of the telephone conversations defendant was having at the jail to his present girlfriend if she testified at the hearing. He stated that both the State and his attorney blackmailed him. He then detailed numerous instances in which he believed he was railroaded prior to and during the trial. He stated he felt "like this is kangaroo court" and felt his rights were "being ignored." He claimed the State compared him to a dog in closing arguments in front of the all-white jury which was "kind of racist." Thereafter, the State and defense counsel addressed the mitigating and aggravating factors. Following arguments, the court sentenced defendant to 14½ years in IDOC at 85%, 2 years' mandatory supervised release (MSR) on count II, and 8 years on count III at 50%, 2 years' MSR, with the sentences to run concurrently. Defendant advised the court that he wished to appeal.

¶ 53                                    II. ANALYSIS

¶ 54    On appeal, defendant contends that he was denied his due process right to a record affirmatively establishing he was constitutionally fit to assist counsel at trial and sentencing. He further contends that both his trial and posttrial attorneys were ineffective for failing to investigate the severity of his mental disabilities despite having actual knowledge that he struggled to maintain his mental health. Finally, defendant contends his trial counsel was ineffective for failing to sever the charges prior to trial and his posttrial counsel was ineffective for failing to raise the trial counsel's ineffectiveness before or after sentencing.

¶ 55                        A. Defendant's Fitness to Stand Trial

¶ 56    Defendant concedes he failed to preserve his claim of error below and, therefore, review must be under the principles of the plain-error doctrine. The plain-error doctrine serves as " 'a narrow and limited exception' " to the general forfeiture rule. *People v. Szabo*, 113 Ill. 2d 83, 94 (1986) (quoting *People v. Pastorino*, 91 Ill. 2d 178, 188 (1982)). On review, a court may address unpreserved error "when a clear and obvious error occurs and (1) the evidence is closely balanced; or (2) that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). "Since the right to be fit for trial is 'fundamental,' the question as to a defendant's fitness may be reviewed for plain error under the second prong." *People v. Khan*, 2021 IL App (1st) 190051, ¶ 63. However, where there is no error, there can be no plain error. *Bannister*, 232 Ill. 2d at 71.

¶ 57    "The due process clause of the fourteenth amendment bars prosecution of a defendant unfit to stand trial." *People v. Holt*, 2014 IL 116989, ¶ 51. "A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2018). "A defendant is entitled to a

23

fitness hearing only when a *bona fide* doubt of the defendant's fitness is raised." *People v. Easley*, 192 Ill. 2d 307, 318 (2000).

¶ 58    Defendants are presumed fit to stand trial and be sentenced. 725 ILCS 5/104-10 (West 2018). A *bona fide* doubt requires a finding "at the time of trial, there were facts in existence which raised a real, substantial and legitimate doubt as to his mental capacity to meaningfully participate in his defense and cooperate with counsel." *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991). "Whether or not a *bona fide* doubt of fitness has been raised is largely within the discretion of the trial court." *People v. Eddmonds*, 101 Ill. 2d 44, 56 (1984). Relevant factors considered by a trial court include "a defendant's 'irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial.' " *Eddmonds*, 143 Ill. 2d at 518 (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). Representations by defense counsel addressing a client's competence, "while not conclusive, are another important factor to consider." *Id*. "Fitness speaks only to a person's ability to function within the context of trial; it does not refer to sanity or competence in other areas." *People v. Coleman*, 168 Ill. 2d 509, 524 (1995).

¶ 59    On appeal, defendant initially contends the trial court had a duty to order a fitness examination, claiming the trial court was present during all the proceedings and therefore was present when defendant "repeatedly asked for a psychiatric evaluation; when he began to cry; when he stated—over and over—that he did not understand the nature of the proceedings; when he accused trial counsel of working for the State, and when he pled—often desperately—for new counsel because of a breakdown in the existing attorney-client relationship."

¶ 60    Our review of the record fails to support the dramatic flair contained in defendant's argument or raise a "real, substantial and legitimate doubt" as to defendant's fitness to understand the proceedings or assist in the defense. Contrary to the claim, few, if any, of the actual events

24

displayed a failure to understand the proceedings. Instead, the record only revealed defendant's refusal to work with his assigned public defender and defendant's claim that his counsel would not file pleadings defendant thought relevant. While defendant repeatedly claimed his appointed counsel antagonized him, the record is replete with defendant's complaints against both of his appointed attorneys and his continued refusal to work with either of them because he did not like what they were telling him. Such statements are not indicative of defendant's lack of fitness. See *Easley*, 192 Ill. 2d at 320.

¶ 61    While defendant argues that his "outbursts" were evidence of his unfitness that should have triggered the court to require a fitness evaluation, we do not believe defendant's statements were incoherent or an indication of unfitness. A close review of the record reveals defendant's disdain for his counsel coupled with a strong awareness of the lack of physical evidence against him, the witnesses the State intended to use, motions he wanted his counsel to file, and a defense strategy based thereon. Such actions fail to support a claim of mental unfitness and instead reveal a calculated and cogent understanding of the proceedings. While defendant claims the court's frequent admonishments about outbursts is further evidence of his mental illness, we note that almost all of the court's admonishments were preluded by language specifically stating defendant should not be offended by the court's statements or questions, because the court was required to make such statements or ask such questions. Further, the court specifically stated that it did not believe it needed to admonish defendant about his behavior in court because the court knew defendant would not misbehave during the trial.

¶ 62    Defendant also relies on previous mental health notes listed in his PSI report to claim the trial court should have ordered a fitness exam; however, such argument fails to note the two previously performed mental evaluations which found defendant fit to stand trial. Further, having

25

mental health issues does not—in and of itself—raise a *bona fide* doubt of fitness. *Eddmonds*, 143 Ill. 2d at 519; *Holt*, 2014 IL 116989, ¶ 46. Defendant's argument also fails to note defendant's July 28, 2020, statement, after complaining that he was convicted by a corrupt jury and a kangaroo court, which stated, "I am tired of it. I am not crazy. I am not mentally ill or retarded or anything. I am just upset."

¶ 63    Nor do we believe the charges and alleged facts suggested that defendant was unfit, or his refusal to accept a plea, when offered, was indicative of unfitness. It is a defendant's right to forego a deal, and request a trial, when, as seen here, defendant steadfastly maintained he did not commit the crime. The record contains repeated conversations between defendant and the trial court discussing the lack of DNA and fingerprint evidence, as well as the credibility of Antonio Graham. Such understanding of the evidence and witnesses undermines any claim of mental unfitness or inability to function within the context of a trial. See *People v. Shum*, 207 Ill. 2d 47, 59 (2003).

¶ 64    Throughout the process of the trial, the court acknowledged defendant's fitness at least four times. Each time, the trial court explicitly stated it had no concerns as to defendant's fitness and noted—several times—defendant was able to effectively communicate during the proceedings.

¶ 65    "If the trial court is not convinced [that a] *bona fide* doubt is raised, it has the discretion under section 104-11(b) to grant [or deny] the defendant's request for appointment of an expert to aid in that determination." *People v. Hanson*, 212 Ill. 2d 212, 217 (2004). Defense counsel and the court, after previously having numerous verbal exchanges with defendant, stated for the record that no *bona fide* doubt existed as to defendant's fitness to stand trial. There is no basis in the record to find the court abused its discretion. As such, it was not error for the trial court to deny defendant's request. With no error, plain error cannot be found.

26

¶ 66    Defendant also argues that both his trial and posttrial counsel were ineffective in failing to request a fitness hearing. He claims that trial counsel's "repeated assurance that [defendant] was fit are far from reassuring" and instead contends that counsel "too believed the record at least raised some doubt as to [defendant's] fitness to proceed." We disagree.

¶ 67    To establish ineffective assistance of counsel, a defendant must satisfy the two-prong test in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. Evans*, 186 Ill. 2d 83, 94 (1999). The first prong requires defendant to demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The second prong requires defendant to demonstrate that counsel's deficiency was prejudicial by showing that " 'but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Eddmonds*, 143 Ill. 2d at 511 (quoting *Strickland*, 466 U.S. at 694).

¶ 68    "To establish that the failure to request a fitness hearing prejudiced a defendant within the meaning of *Strickland*, a defendant must show that facts existed at the time of trial that would have raised a *bona fide* doubt of his ability 'to understand the nature and purpose of the proceedings against him or to assist in his defense.' " *People v. Harris*, 206 Ill. 2d 293, 304 (2002) (quoting 725 ILCS 5/104-10 (West 1998)). Defendant does not allege additional facts not found in the record, and—as shown above—the record does not show there was a *bona fide* doubt as to defendant's fitness. Therefore, neither trial nor posttrial counsel were ineffective for failing to request a fitness hearing. As no error is found, it is unnecessary to address the prejudice prong. *People v. Griffin*, 178 Ill. 2d 65, 74 (1997).

¶ 69    Defendant also argues that the failure to conduct a contemporaneous fitness evaluation cannot be remedied by holding a retrospective hearing, citing *People v. Esang*, 396 Ill. App. 3d

27

833, 840 (2009). Here, however, the evidence fails to support defendant's contention that any fitness evaluation was necessary. As such, defendant's argument is moot.

¶ 70                    B. Failure to Investigate Defendant's Mental Health

¶ 71    Defendant also argues that both his trial and posttrial counsels were ineffective for failing to investigate the severity of his mental disabilities in light of their actual knowledge that defendant struggled to maintain his mental health. He contends "it was plausible that such investigation would have determined that defendant was insane, or less culpable for his actions on the day the crimes were committed." As noted above, a claim for ineffective assistance of counsel must meet the *Strickland* two-pronged test, and defendant has the burden of proving both prongs. *Griffin*, 178 Ill. 2d at 73-74.

¶ 72    Defendant claims this case is "legally indistinguishable" from the decisions issued in *People v. Clark*, 2011 IL App (2d) 100188, and *Brown v. Sternes*, 304 F.3d 677 (7th Cir. 2002). We disagree.

¶ 73    In *Clark*, in addition to defendant's first counsel requesting a fitness evaluation, which was withdrawn by his second counsel, evidence revealed that defendant's girlfriend, who was also the victim, was prepared to testify that defendant was a diagnosed schizophrenic who was off his medications at the time of the offense. *Clark*, 2011 IL App (2d) 100188, ¶¶ 4-5. Defendant later entered a negotiated plea after his second counsel advised him "there were no witnesses available to testify on his behalf." *Id.* ¶¶ 8-9. It was undisputed that defendant maintained to his trial counsel that he suffered from mental health issues, which were " 'an underlying cause of the incident.' " *Id.* ¶ 10. Here, defendant points to no evidence that he was off his medication at the time the crime was committed or that the crime occurred because of defendant's failure to take any medication.

28

¶ 74    In *Brown*, defendant's trial counsel was advised by a different attorney from another case that defendant had a history of mental illness and received psychotropic medication while previously incarcerated. *Brown*, 304 F.3d at 682. The medical records from defendant's prior incarceration revealed that defendant had schizophrenia " 'which hinder[ed] his daily functioning.' " *Id*. at 688. Here, while there is no dispute that defendant received mental health treatment in the past, there was no finding that any condition "hindered his daily functioning" or was related to the alleged criminal incident.

¶ 75    Nor could there be such finding when the record reveals defendant's frequent and persistent declarations that he did not commit the crime. Contrary to defendant's contentions, trial counsel did investigate the possibility of an insanity defense and discarded the option as part of his trial strategy in the case at bar. Trial counsel specifically advised the court that he had no *bona fide* doubt as to defendant's sanity "at the time of the offense" and further stated, "[Defendant] obviously says he did not commit it, and so his affirmative defense of insanity would not be an offense that can be utilized."

¶ 76    "While we acknowledge that professional legal assistance may, from time to time, require research into a potential insanity defense, we are not ready to accept the notion that competent representation requires a defense attorney to maintain a defense theory inconsistent with a client's claimed innocence." *People v. Sims*, 322 Ill. App. 3d 397, 409 (2001). "[S]trategic decisions of trial counsel are generally protected by a strong presumption that the attorney's decisions reflect sound trial strategy rather than incompetence." *People v. Heard*, 187 Ill. 2d 36, 56 (1999). Here, just as in *Sims*, defendant insisted in his defense of innocence, and any claim to the contrary, *i.e.*, an affirmative defense claiming insanity at the time the crime was committed, directly opposed defendant's viable theory of the case. Trial counsel's statement confirms the defense was

29

considered, but discarded, based on defendant's persistence in claiming innocence. As such, we disagree that trial counsel's failure to present an insanity defense is evidence of a deficient performance by trial counsel.

¶ 77    Defendant also argues that his posttrial counsel was ineffective for failing to investigate defendant's mental illness because she failed to mention the condition during the sentencing proceeding as mitigation evidence. In order to present such mitigation argument, the evidence would require sentencing counsel to show that "[a]t the time of the offense, the defendant was suffering from a serious mental illness which, though insufficient to establish the defense of insanity, substantially affected his or her ability to understand the nature of his or her acts or to conform his or her conduct to the requirements of the law." 730 ILCS 5/5-5-3.1(a)(16) (West 2018).

¶ 78    While there is no dispute that defendant's PSI revealed prior treatment for depression and anger management issues, there is no evidence that sentencing counsel failed to investigate the issue or that her decision not to mention defendant's history as a mitigating factor was not trial strategy. As noted above, defendant's defense was that he did not commit the crime for which he was charged, and he repeatedly proclaimed his innocence to the trial court.

¶ 79    Even if posttrial counsel believed the mitigating factor was possible upon receipt of the PSI, such reliance was hindered by defendant's persistence in arguing that he did not commit the crime and defendant's statements undermining any reliance on mental illness as a mitigating factor. Given the facts, evidence, and statements by defendant, we cannot find that posttrial counsel's decision not to raise mental illness as a mitigating factor was not trial strategy. As such, we decline to find that posttrial counsel's decision not to raise mental illness as a mitigating factor was evidence of deficient performance or indicative of ineffective assistance of counsel.

30

¶ 80                                    C. Severance

¶ 81    Finally, defendant argues that his trial counsel was ineffective for failing to sever charges prior to trial and his posttrial counsel was ineffective for failing to raise the issue of trial counsel's ineffectiveness before or after sentencing. In support, he claims that while his trial counsel was aware of the potential prejudice to defendant on this issue, he "made no attempt to sever the charges despite discussions during a two-day *Montgomery* hearing about this very issue" and "was completely unaware of his legal ability to eliminate that prejudice by moving for severance or stipulating to [defendant's] felony status without identifying the nature of the prior convictions."

¶ 82    It has long been held that a decision to not seek a severance, even if "unwise in hindsight," is regarded as a matter of trial strategy. *People v. Poole*, 2012 IL App (4th) 101017, ¶ 10 (citing *People v. Turner*, 36 Ill. App. 3d 77, 81 (1976)). "Strategic decisions, such as pretrial motion practice, are insulated from *Strickland* challenges." *People v. Johnson*, 205 Ill. 2d 381, 407 (2002); accord *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991); *People v. Bryant*, 128 Ill. 2d 448, 459 (1989). "When counsel is planning trial strategy, judgments must be made and any errors in judgment do not constitute ineffective assistance of counsel." *Bryant*, 128 Ill. 2d at 458-59 (citing *People v. Stewart*, 104 Ill. 2d 463, 492 (1984)). Here, there is no evidence that the lack of any motion to sever was anything other than trial strategy. As such, we decline to find trial counsel's decision not to file a motion to sever was evidence of a deficient performance.

¶ 83    Defendant's argument related to his posttrial counsel is equally infirm. The issue of severance has long been accepted as one of trial strategy See *Poole*, 2012 IL App (4th) 101017, ¶ 10. If trial counsel is not ineffective for failing to sever the charges, it is axiomatic that posttrial counsel is not ineffective for failing to raise such claim. As such, we also decline to find defendant's posttrial counsel was ineffective.

31

¶ 84                                    III. CONCLUSION

¶ 85    For the foregoing reasons, we affirm defendant's conviction and sentence.


¶ 86    Affirmed.